IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------

DANIELLE KURIN,

      Plaintiff,

v.

MICHAEL BALTER,

      Defendant.

---------------------------------------------------------------------

**JURY TRIAL DEMANDED**

Civil Action No. _____

## **COMPLAINT FOR DEFAMATION AND RELATED TORTS**

Plaintiff Danielle Kurin ("Kurin"), by her attorney Dave Scher, for her Compliant for against Defendant Michael Balter ("Balter"), respectfully alleges as follows:

### **INTRODUCTION**

1.      Defendant Balter owns and operates a blog located at http://michael-balter.blogspot.com/.

2.      On Balter's blog he has published numerous libelous statements regarding Kurin, an Assistant Professor of Anthropology and Director of the PL Walker Bioarchaeology and Biogeochemistry Laboratory at the University of California, Santa Barbara ("UCSB").

3.      Balter's false and defamatory statements include alleging that Kurin was accused of sexual misconduct, that Kurin covered-up sexual misconduct, and that she was found "guilty" of the same by her employer, UCSB.

4.      Balter has republished and made additional false and defamatory statements in other forums as well, including on Facebook, Twitter, and on his Amazon.com author profile.

5.      Balter's false and defamatory statements were made with actual malice and with the intent to destroy Kurin's reputation and career, and to prevent her from obtaining tenure at UCSB.

## JURISDICTION AND VENUE

6.      Kurin is an individual and resides in both Santa Barbara, California and Falls Church, Virginia.

7.      Balter is a resident of this District who may be served with process at his personal residence in Croton on Hudson, New York.

8.      Kurin and Balter are citizens of different states and the matter in controversy between them exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Kurin's damages greatly exceed the statutory minimum of $75,000 required to obtain jurisdiction in this matter, the amount of which does not represent the full value of the damages suffered by Kurin.

10.      This Court has jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a)(1).

11.      Kurin suffered the injuries alleged herein in the State of New York, as well as on a national basis.

12.      Balter published his false and defamatory statements referenced herein from the State of New York by issuing the accusations on the Internet with the knowledge and expectation that same would be republished by the media due to the national interest in the #metoo movement, and the global interest in anthropology as well as the international nature of Kurin's work.

13.      This Court has personal jurisdiction over Balter, including both specific and general jurisdiction.

2

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1)-(2).

**PLAINTIFF**

15.     Kurin serves as Assistant Professor of Anthropology and Director of the PL Walker Bioarchaeology and Biogeochemistry Laboratory at UCSB.

16.     In 2005, Kurin received her artium baccalaureus with honors in Anthropology from Bryn Mawr College. In 2008, she earned her M.A. in Anthropology from Vanderbilt University, and in 2012, she completed her Ph.D. in Anthropology also at Vanderbilt University.

17.     A broadly trained anthropological bioarchaeologist, Kurin has led several international, multi-disciplinary bioarchaeology field programs in south-central Peru. This work has been supported by the National Science Foundation, the Fulbright IIE and Fulbright–Hays programs, Vanderbilt University, and the University of California, among others.

18.     A dedicated, award-winner teacher-scholar fluent in Spanish and conversant in Quechua, Kurin has authored a book and co-authored more than a dozen scholarly publications in in books and academic journals, and she has supervised hundreds of Peruvian and American undergraduate and graduate-level research projects. She also dedicates her services as a forensic anthropologist to the Peruvian Ministry of Justice and California State and Federal authorities in cases of identifying human remains.

19.     Kurin has often been invited to speak at universities, museums, and other institutions in the United States and abroad, and she has provided expert opinions to *National Public Radio*, *TVPeru*, and the *LA Times* regarding research relevant to her field.

20.     UCSB has scheduled Kurin to apply for tenure in September of 2020.

**DEFENDANT**

21.     Defendant Michael Balter is an individual and is now, and at all relevant times mentioned in this complaint was, a resident of Croton on Hudson, New York.

22.     Balter is a self-described archeologist and a former adjunct professor.

23.     Balter runs his own blog: http://michael-balter.blogspot.com/.

24.     Balter also publishes stories in a number of magazines and online publications.

25.     In 2005, Balter published a purported archaeology book about the Turkish city of Catalhoyuk.

26.     There are a handful of moderate reviews of Balter's book, as well as harsh criticisms that rather than focusing on archaeology, Balter instead chose to write about "who [the archeologists] hooked up with and when," as described by Amazon user Maija Jespersen on September 12, 2012.

https://www.amazon.com/GoddessBullCatalhoyukArchaeologicalCivilization/dp/1598740695/ref=cm_cr_arp_d_product_top?ie=UTF8#customerReviews (last visited June 3, 2020).

27.     The same review also describes Balter as "unreasonably critical" of a female archeologist and questions his honesty and the accuracy of his reporting: "He quotes [the female archaeologist] as saying that an arrowhead undeniably represents a female pubis, when in all of her comprehensively illustrated books there is not a single arrowhead. I really doubt his statement is accurate, especially given how he misinterprets her other findings." *Id*.

28.     Another Amazon user, Wulf Barnim, issued a one star review on November 7, 2006, and commented: "If you love gossip go for it though. You will learn everything about the secret lifes [sic] of archeologists (how they play and mate)." *Id*.

4

29.     In 2016, Science Magazine fired Balter for misconduct and a "serious breach of trust" after he accused a professor of exaggerated charges of sexual harassment and hounded the accused, his friends, family, and colleagues. *See* https://www.imediaethics.org/science-michael-balter-fired/ (last visited June 3, 2020); http://jonfwilkins.com/2016/03/science-magazine-fires-michael-balter-who-wrote-that-sexual-misconduct-article/ (last visited June 3, 2020).

30.     Consistent with Balter's obsession of discussing his perceptions of others' sexual habits and behaviors, Balter's blog contain numerous accusations of sexual harassment and enabling sexual harassment against various people, including administrative staff of universities.

31.     Balter's blog contains a page titled: "A #STEMToo Rogue's Gallery of sexual harassers, predators, and bullies in the sciences [Continually updated]," on which Balter maintains a running list of nearly 40 individuals that he is targeting, with links to any relevant pages on his own blog. *See* http://michael-balter.blogspot.com/2018/12/sexual-abusers-i-have-known.html (last visited June 11, 2020).

32.     In April of 2019, Balter was forcibly detained by security and then ejected from a Society for American Archeology annual conference after he tried to physically assault an alleged sexual harasser at a conference – and refused to calm down or disengage and behave himself in a civil manner. Balter's explanation: "I considered this an emergency." https://www.the-scientist.com/news-opinion/an-archaeology-meeting-finds-itself-in-the-middle-of--metoostem-65737 (last visited June 3, 2020).

33.     In April of 2020, Balter accused Ran Boytner, the executive director of the Institute for Field Research ("IFR") of a massive cover up related to systemic misconduct, something Boytner adamantly denied in a persuasive and credible statement, also published by

Balter but decried by him as "lies." *See* http://michael-balter.blogspot.com/2020/04/field-school-directors-ask-why-umbrella.html (last visited June 11, 2020).

34.     On May 20, 2020, Balter published a blog accusing yet another professor – this one in Australia – of being a "sexual predator" and "pedophile protector." *See* http://michael-balter.blogspot.com/2020/05/peter-rathjen-serial-sexual-predator.html (last visited June 11, 2020).

35.     Just recently, in May of 2020, the City University of New York fired Balter from the last job he had—as part time adjunct instructor ironically teaching a single introductory course on the methods and ethics of journalism. *See* http://michael-balter.blogspot.com/2020/05/on-not-being-reappointed-farewell.html (last visited June 11, 2020).

36.     Balter, in his blog, takes no responsibility for his firing. Instead he accuses the university of failing to address shortages in funding in part related to COVID-19.

## FACTUAL BACKGROUND

37.     In September 2015, Kurin ran a small independent archeological field program in Peru with her then fiancée, Emanuel Gomez, whom she was married to briefly between 2016 and 2019.

38.     An alleged incident occurred after the 5-days of project work ended, leading to one of the participants – who did not actually witness the rumored incident, to make a third-party accusation to UCSB of sexual harassment against Gomez.

39.     Kurin cooperated with UCSB's investigation.

40.     UCSB never charged Kurin with sexual harassment or enabling a sexual harasser, and Gomez was never charged with any crime.

41.     Kurin has never been "found guilty" (or even civilly liable) of anything relating to sexual harassment, assault, or misconduct by any governing body of any kind, anywhere.

42.     During the course of its investigation, UCSB became aware of communications Kurin had with participants who had been on the trip to Peru. UCSB then investigated Kurin's interactions with the individuals.

43.     Between 2016 and 2018, Kurin engaged in the UCSB disciplinary process, and utilizing the proper forums available to her as a professor, she amicably settled the matter with UCSB in March 2018. Neither UCSB nor any other entity found Kurin guilty or liable for any misconduct.

44.     In 2016, Kurin and Gomez married.

45.     In 2018, while on leave, Kurin was asked to assist in organizing and managing an IFR field school in Peru, directed by a third party. While there, an incident allegedly occurred involving several Peruvians, including Gomez. Upon discovery, Kurin immediately reported the incident to the appropriate authorities and fully cooperated in the ensuing investigation.

46.     UCSB was completely uninvolved in the second incident. Instead, the IFR conducted an investigation. The IFR substantiated an act of inappropriate behavior against Gomez and at least one other Peruvian. It did not find misconduct against Kurin, but decided to end its relationship with her field program, without prejudice.

47.     Soon after the IFR completed its investigation, Kurin filed for divorce from Gomez.

48.     Kurin has not communicated substantively with Gomez, save for effecting the divorce, for close to two years as of the date of filing of this Complaint.

49.     In September 2019, Kurin returned to UCSB as a full-time assistant professor and has been highly successful.

50.     Kurin has consistently received exceptional teaching evaluations and is consistently among the highest rated professors in the Anthropology Department. She has also been invited to give lectures and to submit articles and books for publication.

51.     In the Spring of 2020, UCSB advised Kurin to prepare materials so she could apply for tenure in September, 2020.

52.     Nevertheless, Balter's lies and misrepresentations have caused Kurin severe harm.

53.     Unfortunately, many of Kurin's students, colleagues, supervisors and administrators – the people directly influencing her career – have been deeply affected by Balter's blogs. As described below, Balter intends to—and has—irreparably and severely damaged Kurin's reputation and her career.

54.     Other than the severe damage caused by Balter's lies, Kurin is highly regarded at UCSB and enjoy a very strong reputation as a professor, mentor, and scholar.

## DEFAMATION *PER SE*

55.     Upon Kurin's return to UCSB in 2019, Balter discovered that Kurin had been on leave after the UCSB investigation.

56.     Balter submitted a request under the California Public Records Act to UCSB.

57.     Balter also called and emailed numerous professors, students, and administrators – harassing them endlessly and making spurious allegations against Kurin.

58.     A few students did speak to Balter, and their hearsay-gossip-opinion-laden remarks are included in his blogs, but they provide few actual facts.

59.     Balter published his first blog about Kurin on February 28, 2020. http://michael-balter.blogspot.com/2020/02/at-uc-santa-barbara-and-in-peru.html (last visited June 11, 2020) ("Blog 1"). A copy of Blog 1 and related comments is attached hereto as **Exhibit 1**.

60.     Blog 1 contains the following false statements of purported fact:

a.  "an Archeological couple accused of engaging in sexual misconduct." Kurin was not, and never was, accused of sexual misconduct by any governing body on earth (and Kurin was divorced at the time the blog came out).

b.  "Kurin's partner" (referring to her ex-husband Gomez). While Kurin was married to Gomez from 2016 to 2019, at the time of the blog, they were divorced and had not even seen or conversed with each other in over a year. The implication in the publication is that Kurin is still with and protecting Gomez – this is false.

c.  "Kurin was found guilty…of retaliating against students." Kurin has never been found guilty by any governing body anywhere of anything.

d.  "The same was true for Kurin's habitual efforts to cover up Gomez's misconduct." Kurin has never made efforts to cover up sexual harassment or Gomez's conduct, nor has she ever been charged by any governing body (including UCSB and the IFR) of covering up sexual harassment.

e.  "While Kurin eventually declined to cooperate with the Title IX investigation." Kurin cooperated fully with the Title IX investigation until the investigator told her that her opinion and exculpatory evidence was of no interest to them.

f.  "Kurin and Gomez are a continuing danger to students" Kurin does not pose a danger to students.

g.  "[T]here are already signs that the archeology community is frowning on her
[Kurin's] history of enabling sexual misconduct." None of this statement is true.
The archeology community is not "frowning" on Kurin – except due to the
reputation damage caused by Balter's lies. Kurin has no history of "enabling
sexual misconduct." Kurin has never "enable[ed] sexual misconduct" and has
never been found liable for doing so, ever. This statement is made with no
purpose other than to damage Kurin's professional reputation.

h.  Balter repeatedly accuses UCSB of a "cover up" and leaving faculty "in the dark."
This is false. UCSB honored a settlement agreement, as did Kurin. Indeed, the
investigating body at IFR told Balter it is "thoroughly disappointed with [his] lack
of journalistic integrity. You [Balter] are publishing falsehoods." Rather than see
reality and truth, Balter published the letter suggesting that IFR is just part of the
same massive conspiracy (that doesn't actually exist).

61.    The same day, Balter also published a link to Blog 1 in the public Facebook group

BioAnthopology News:

https://www.facebook.com/groups/BioAnthNews/permalink/10156872951471475/ (last visited

June 14, 2020). A copy of the post is attached hereto as **Exhibit 2**. As of June 14, 2020, the

group has 25,001 members. Several people commented and responded to Balter's defamatory

post.

62.    Balter also repeatedly published links to Blog 1 on his public Facebook profile

with more than 880 Facebook friends. Each time, his post was captioned: "At UC Santa Barbara

and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation

against victims." The posts feature Kurin's picture and name. Several people reacted to,

10

commented on, and shared his posts. Attached as **Exhibits 3, 4, and** 5 are three examples of such

posts, which republished the defamatory material contained in Blog 1:

      a.   https://www.facebook.com/michael.balter.73/posts/10158161887442363, posted

          February 28, 2020;

      b.   https://www.facebook.com/michael.balter.73/posts/10158168476292363, posted

          March 1, 2020; and

      c.   https://www.facebook.com/michael.balter.73/posts/10158191803352363, posted

          March 8, 2020.

63.     Balter published another blog on March 11, 2020: http://michael-

balter.blogspot.com/2020/03/uc-santa-barbara-kept-misconduct.html (last visited June 11, 2020)

("Blog 2"). A copy of Blog 2 is attached hereto as **Exhibit 6**.

64.     Blog 2 contains the following false statements of purported fact:

      a.   "an archeological couple – a sexual predator and his enabler -- …allowing further

          episodes of misconduct." The entire title of the blog is false, but these

          components are false as to Kurin: 1) she is single and not a couple with Gomez; 2)

          she is not a sexual predator enabler of anyone; and 3) she did not engage in

          "further episodes of misconduct."

      b.   "this couple had been found guilty in June 2016 of Title IX offenses by the

          university." Kurin was never found guilty of anything by the university (or

          anyone else) of anything.

      c.   "Kurin was found guilty of retaliating against students." Kurin was never found

          guilty of anything by the university (or anyone else) of anything.

   d.  A picture of Kurin with the caption: "Sexual predator's enabler?" The question

       mark does not save Balter – he himself states in the same blog "When I speculate

       or editorialize, I have made that entirely clear." Kurin is not and never was a

       "sexual predator's enabler" nor was she ever even accused of such conduct.

   e.  "Kurin and Gomez were found guilty of Title IX offenses in June 2016." This is

       false.

   f.  "As we know, in June 2016 both Kurin and Gomez were found guilty of Title IX

       charges." This is false.

   65.    On the same day, Balter published a link to Blog 2 as a comment to his prior

February 28, 2020 post in the public Facebook group BioAnthropology News:

https://www.facebook.com/groups/BioAnthNews/permalink/10156872951471475/. The

comment is visible in **Exhibit 2 at 3.**

   66.    Balter also repeatedly published links to Blog 2 on his public Facebook profile

with more than 880 Facebook friends. Several people reacted to, commented on, and shared his

posts. Attached as **Exhibits 7 to 12** are six examples of such posts, which republished the

defamatory material contained in Blog 2:

   a.  https://www.facebook.com/michael.balter.73/posts/10158201130832363, posted

       on March 11, 2020;

   b.  https://www.facebook.com/michael.balter.73/posts/10158204516972363, posted

       on March 12, 2020;

   c.  https://www.facebook.com/michael.balter.73/posts/10158213594337363, posted

       on March 15, 2020;

     d.   https://www.facebook.com/michael.balter.73/posts/10158213051907363, posted

on March 15, 2020;

     e.   https://www.facebook.com/michael.balter.73/posts/10158216832142363, posted

on March 16, 2020; and

     f.   https://www.facebook.com/michael.balter.73/posts/10158249299712363, posted

on March 24, 2020.

     67.     On March 17, 2020, Balter also published a link to Blog 2 as a comment to

another post on his public Facebook profile:

https://www.facebook.com/michael.balter.73/posts/10158822411997363. A copy is attached

hereto as **Exhibit 13**.

     68.     Balter published another blog on April 25, 2020, in which he republishes his prior

defamatory statements about Kurin. http://michael-balter.blogspot.com/2020/04/field-school-

directors-ask-why-umbrella.html (last visited June 11, 2020) ("Blog 3"). A copy of Blog 3 is

attached hereto as **Exhibit 14**.

     69.     In Blog 3, Balter attacks the IFR and accuses it of covering up sexual assaults.

Balter accuses a former IFR board member of having "actively worked to cover up this alleged

misconduct by Boytner, including lying to me and others about what they knew not only about

Boytner's history--but also about a field school director who had been found guilty herself of

retaliating against students (Danielle Kurin of UC Santa Barbara.)" Balter links the words "who

had been found guilty herself of retaliating against students" to Blog 2.

     70.     On May 21, 2020, an anonymous poster commenting on Blog 3 wrote in pertinent

part:

          In 2019, Kurin was brought for tenure review, as Balter reported,
          indicating that the above is a fact. I do not know the facts of the

investigation or its findings. But the Title IX office at UCSB consists of professional staff who specialize in Title IX violations. If, after 2.5 years of investigation, they decided to return Kurin to her ladder faculty post without any stated restrictions, seems to me that Boytner assertion that she was exonerated (whether he said that or not) is true. I am not sure what the lie is here.

http://michael-balter.blogspot.com/2020/04/field-school-directors-ask-why-umbrella.html?showComment=1590089357984#c7414929527803796598.

71.     Balter responded to the anonymous commenter the same day and made additional false and defamatory statements about Kurin:

I'm publishing this last Anonymous comment because nearly every statement in it is wrong. But instead of going through it point by point, I will identify the most egregious error: I reported earlier on the documentation that both Kurin and her partner Gomez had been found guilty in the 2016 Title IX proceedings, documentation that I was provided by UCSB via the California public records act. So Kurin was not exonerated and that is documented.

*Id*. Again, Kurin was never "found guilty" of anything. The comment and Balter's response are included in **Exhibit 14 at 42-44**.

72.     At some time in or about October 2019, Balter also published Kurin's name, and later links to Blog 1 and Blog 2, on a page titled "A #STEMToo Rogue's Gallery of sexual harassers, predators, and bullies in the sciences [Continually updated]." The URL, https://michael-balter.blogspot.com/2018/12/sexual-abusers-i-have-known.html, labels Kurin as a "sexual abuser." Kurin has never committed an act of sexual abuse, nor is she a sexual harasser, predator, or bully. Such an accusation is false, injurious, and malicious. A copy of this blog is included as **Exhibit 15**.

73.     Balter also posts links, including headlines and summaries, to his defamatory blogs on his Amazon.com Author Profile, located at https://www.amazon.com/Michael-Balter/e/B001IQUL0Y%3Fref=dbs_a_mng_rwt_scns_share. A screen shot of Balter's Author

Profile showing an excerpt of his republication of Blog 1 and Blog 2 is attached hereto as **Exhibit 16**.

74.     Balter's statements are objectively false and libelous *per se*. Merely looking at the actual record would reveal that Kurin was never "found guilty" of anything. Such an accusation is false, injurious, and malicious.

75.     Balter's blogs try to thread a conspiracy of malicious administrators of UCSB, IFR, and others that just isn't there, and his repeated republications of his defamatory blogs demonstrate that he has no intent other than to harm Kurin and generate publicity for himself.

76.     Balter also targeted Kurin on his Twitter account under the handle @mbalter, with more than 5,700 followers. Balter repeatedly republished his defamatory blogs, proclaimed Kurin's "guilt," and even appealed to UCSB to terminate Kurin. Attached as **Exhibits 17, 18, and 19** are examples of tweets targeting Kurin:

   a.   May 4, 2020: "From the Rogue's Gallery of sexual predators: Enmanuel Gomez Choque and Danielle Kurin #Archaeology #MeToo #STEMToo @ucsantabarbara @IFRArchaeology http://michael-balter.blogspot.com/2020/02/at-uc-santa-barbara-and-in-peru.html and http://michael-balter.blogspot.com/2020/03/uc-santa-barbara-kept-misconduct.html."
   https://twitter.com/mbalter/status/1260894940739129344.

   b.   June 5, 2020: "If the #anthropology department at @Harvard can ask sexual predator Gary Urton to resign, then the anthro dept at @ucsantabarbara can ask Danielle Kurin—now on her second Title IX for enabling her sexual predator partner—to resign as well. @Archaeology #MeToo."
   https://twitter.com/mbalter/status/1268963951481675782.

    c.    June 5, 2020: "Both Kurin and Gomez were found guilty in a 2016 Title IX

        proceeding at @ucsantabarbara. Kurin is now undergoing more Title IX

        proceedings due to sexual assaults that took place at her 2018 field school,

        committed by Gomez. #MeToo."

        https://twitter.com/mbalter/status/1268983388221984769.

77.    As discussed at length above, these tweets, and others, are full of falsehoods and

libelous *per se*. They also evidence Balter's specific intent to bring about the termination of

Kurin's employment.

78.    Unfortunately, tens, if not hundreds, of thousands, of people have read Balter's

falsehoods (as he himself notes in his blogs) – and those people, largely in Kurin's circle, her

colleagues, supervisors, and management, have all been turned upside down, gaslighted by the

piles of Balter's falsehoods. As a result, and described below, Balter's defamation has severely

damaged Kurin's reputation, her career, and prospects of gaining tenure (which, of course, is

Balter's actual goal).

79.    The above-described publications were not privileged. They were published by

Balter, acting as a journalist on the internet, with the knowledge of their falsity, and with the

purpose of generating publicity for himself.

80.    Balter acted with overt malice, hatred, and ill will towards Kurin. Balter's blogs

repeatedly demand that Kurin not be granted tenure and that she otherwise be banned from any

kind of gainful employment. His whole purpose is to destroy Kurin and generate fame for

himself in the process.

81.    On May 11, 2020, a member of the IFR Board (Ran Boytner) wrote a letter

addressing Balter's comments. The letter was leaked to Balter who published it on his blog:

http://michael-balter.blogspot.com/2020/04/field-school-directors-ask-why-umbrella.html (last

visited June 11, 2020). In the letter, Boytner wrote in part:

> The IFR had been accused of covering up accusations against
> Danielle Kurin. A blogger suggested that Willeke Wendrich, Kevin
> Vaughn and myself should have known about accusations and Title
> IX investigation against her. Here are the facts: Ten days before the
> field school directed by Kurin in Peru for summer 2016 was to
> begin, UCLA legal department contacted the IFR and asked for the
> program to be canceled. Health and safety issues were cited as
> reason and no other information was provided. UCLA went out of
> its way to support the students, and together with the IFR, students
> were either placed at other field schools or received full refunds.
> These included all airfare costs. There was no threat of legal action
> as the above refund policy was implemented immediately.
>
> The blogger then accused the IFR for a cover up of Kurin's
> transactions, although he does not explain why so many people
> engaged in such activity and what was their gain (there are 19
> members at the IFR Board of Governors and Academic Board). He
> wrote that Wendrich "must have known" and therefore did know but
> did not share. Kevin Vaughn – then UCLA Extension Associate
> Dean and the then IFR academic partner – also must have known.
> And I knew just because, well, because I am a bad person and bad
> people know bad things. Here are the facts: As the blogger contacted
> the IFR about our relationships with Kurin, Wendrich was appointed
> to act as the IFR spokesperson. She then issued a number of
> statements over the course of a week to the blogger. The blogger did
> not like the statements and became rude and aggressive. On March
> 12 at 4:17pm, Wendrich sent an email to the blogger, writing she is
> no longer interested in interacting with him. By 4:28pm of that day,
> the blogger twitted: "I now have reason to believe that the chair of
> @IFRArchaeology's board of governors, Willeke Wendrich of
> UCLA, is lying about what IFR knew and when it knew it. This
> means the top leadership of the organization is involved in a
> #MeToo coverup." What new information became available to the
> blogger in the 11 minutes between the email and the twit is unclear
> and unstated.
>
> Whether Kevin Vaughn knew about the investigation is irrelevant.
> Vaughn worked at the time for UCLA and his duties were to his
> employer, not IFR. The investigation was confidential, and Vaughn
> was bound by both law and ethics to keep it as such – until told
> otherwise. To discuss a confidential investigation with anyone
> outside UCLA would have exposed Vaughn to serious legal

17

ramification. The blogger suggest that Vaughn should have spread rumors and inform the IFR Board of the investigation that way. Making decisions by rumors is not an advisable way for any organization to take decisions.

There is no explanation why I should have known about the investigation, why I wanted to cover up or what I gained from such behavior. I am, therefore, unable to provide any rational explanation to the blogger's accusation.

During summer 2017, the IFR sent two archaeologists to visit with Kurin's field school at two separate occasions. Their reports and the evaluations of over 35 students were highly positive and the IFR Board decided to continue and to work with Kurin. By 2018, events at the Peru-Wari program caused the IFR to stop working with Kurin and her team.

82. Commenting on the letter, Balter blatantly disregarded its contents and wrote that Boytner's statement was, "full of lies and distortions." *Id*. The letter, including Balter's response, is included in **Exhibit 14 at 5-10.**

83. Balter has continued to this day to wax poetic, continuing to accuse Kurin, the IFR, UCSB and others of all kinds of things – all of which are false.

84. On June 12, 2020, Balter published another blog: http://michael-balter.blogspot.com/2020/06/a-ucla-town-hall-on-meto-and-related.html (last visited June 14, 2020) ("Blog 4"), a copy of which is attached hereto as **Exhibit 20**. In Blog 4, Balter once more republishes Blog 1 and again defames Kurin: "The dramatis personae have included UCSB archaeologist Danielle Kurin, found guilty in a Title IX proceeding in 2016 of retaliating against students who complained about sexual harassment by her partner" (with the underlined words linking to Blog 1).

85. On June 13, 2020, Balter added to Blog 4 and bragged about how far the libelous attack on Kurin published on his blog has reached: "I'm very gratified at the attention that this and earlier blog posts about misconduct in archaeology have received. My update on the

Danielle Kurin Title IX case has generated some 12,000 page views, since this report was posted there have been about 5000 additional page views." The comment is included in **Exhibit 20 at 7**.

86.     Balter doesn't stop at his blogs or at plastering their content all over the internet. In December of 2019, Balter tagged UCSB in a tweet: "@ucsantabarbara really has to stop archaeologist Danielle Kurin from having contact with students. She has retaliated multiple times against students who have complained about sexual harassment and assault her partner." That tweet was liked by 22 people and shared 10 times. As noted above, this entire statement is false. https://twitter.com/mbalter/status/1208445918393065477. A copy of the tweet is attached hereto as **Exhibit 21**.

87.     On June 10 and 11, Balter launched another attack on Kurin on with a fresh string of tweets full of defamatory statements directed at Kurin's employer and her professional community. In this attack, Balter repeatedly tags UCSB with the twitter handle "@ucsantabarbara." Balter falsely states that Kurin is "an enabler of sexual misconduct." He also proclaims that "Kurin is still doing her best to intimidate and threaten students into not speaking about her misconduct." Balter evidences his specific intent to end Kurin's employment, writing: "The bottom line: If @ucsantabarbara will do nothing about Kurin's persistent misconduct, then it's up to the #anthropology department to settle the matter. Kurin is up for tenure. For the sake of victims past and future, don't let her have it." https://twitter.com/mbalter/status/1270877430807498758. A copy of this chain of tweets is attached hereto as **Exhibit 22**.

## DAMAGES

88.     Balter himself admits he is out to destroy Kurin, and indeed he brags about just how many people have seen his false allegations against Kurin.

19

89.     In Blog 1, Balter suggests that Kurin doesn't deserve tenure (without tenure, Kurin's contract at UCSB would be terminated).

90.     Also in his blog Balter acknowledges that Stanford retracted its invitation for Kurin to give a lecture – because of Balter's false accusations.

91.     Balter's falsehoods have been repeated by others in various public sources, e.g.: https://www.reddit.com/r/UCSantaBarbara/comments/fbyzse/pls_read_and_be_aware_professor _who_was_put_on/. This particular post garnered thirty-three comments and 259 "up votes" as of June 14, 2020.

92.     In January of 2020, Kurin nominated a potential Ph.D. grad student to the UCSB program. The student was excited, as she was to be awarded a very generous package of support while working toward her Ph.D., and had come to UCSB campus for a visit. Somehow, during that visit, Balter found out about this prospective student, contacted and hounded via email, wrote numerous lies about Kurin to her, and coerced her to withdraw her candidacy.

93.     In March of 2020, under the guise of "investigating," Balter sent a defamatory email to Kurin's entire department, specifically asking if they knew that Kurin "had been found guilty of retaliation and harassment." This statement is a lie couched in a question – designed for no reason other than to destroy Dr. Kurin's reputation with her colleagues.

94.     Kurin received outstanding reviews from students in her April 2020 teaching evaluations, tainted only by Balter – e.g. "I love professor Kurin a lot! She's fantastic and wonderful and she has inspired me so much. Because of this I was deeply crushed when I learned of her title IX violations. I hope that this issue is addressed so I don't feel sick and like crying in her class."

95.     The student that wrote the above review was reacting to false information she read on Balter's blog. This accusation comes directly and only from Balter's blogsite.

96.     Kurin's speaking engagements have been revoked at Stanford and the University of California, Los Angeles – because – according to the university organizers – "of the publicity."

97.     Kurin has also been contacted by former friends and colleagues with whom she lost touch, who have read Balter's attacks and false words and expressed their sympathy for her plight, indicating just how far Balter's defamation campaign has reached.

98.     Numerous students and professors have approached Kurin to learn her side of the allegations. Kurin tried to take the high road and ignore Balter – which she has done until now (contrary to Balter's accusation that Kurin and UCSB are in some bizarre cover up conspiracy along with apparently the IFR and most of the UCSB administration). However, Kurin is up for tenure and has no choice but to defend her honor and reputation and expose Balter's lie-filled blogs and writings.

99.     As a proximate result of the above-described publications, plaintiff has suffered loss of her reputation, shame, mortification, and injury to herself and her person, in a total amount to be established by proof at trial, but at least $18 million dollars.

100.    Balter has acted with overt malice. His only goal seems to be to destroy Kurin, to ruin her, and to get her fired by preventing her from attaining tenure.

101.    Because of Defendant's malice in repeatedly publishing his defamatory statements and specifically targeting Kurin's employer, colleagues, and students, plaintiff also requests that the Court award punitive damages.

## COUNT I – LIBEL *PER SE*

102.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

103.    Defendant defamed Plaintiff by, *inter alia*, publishing that Plaintiff was accused of sexual misconduct, that Plaintiff covered-up sexual misconduct, that Plaintiff was found "guilty" of the same by her employer, and that she is a current and continuing danger to students.

104.    Defendant's statements were false and Defendant made the statements knowing their falsity. Indeed, the very documents that Defendant purports to rely upon contradict his assertions. Moreover, several individuals contradicted Defendant's statements, and Defendant responded simply by calling them liars and alleging an outlandish conspiracy.

105.    Defendant had no privilege to make his false statements.

106.    Defendant acted with actual malice as demonstrated by repeatedly publishing his false statements on various websites including his blog, Facebook, and Twitter. Defendant deliberately targeted Plaintiff's colleagues, coworkers, students, employer, and others, with the intent of garnering a large and influential audience in order to inflict the maximum harm upon Plaintiff. Indeed, Defendant even tweeted at Plaintiff's employer and expressly called for Plaintiff's employer to take adverse actions against her based upon his false statements.

107.    Defendant also specifically targeted Plaintiff's employment and professional reputation as evidenced by the numerous emails and other communications that he directed to Plaintiff's current and former students, coworkers, colleagues, and others.

108.    Tens, if not hundreds, of thousands of people saw Defendant's libelous statements.

109.    As a direct and proximate result of the false and libelous articles published by Defendant, Plaintiff has suffered public hatred, contempt, scorn, and ridicule.

110.    As set forth above, the false and defamatory statements published by Defendant are libelous *per se* in that they accuse Plaintiff of having committed a crime and of being unfit to practice in her profession. Moreover, Defendant's acts have caused Plaintiff actual harm in an amount that exceeds $75,000.

111.    The above-detailed actions of Defendant were undertaken not just to harm Plaintiff, but were part of pattern of similar conduct aimed at dozens of individuals and institutions in academia and the scientific community in order to damage an industry that has repeatedly rejected Defendant because of his outrageous, irresponsible, irrational, and otherwise harmful behavior.

## COUNT II – SLANDER *PER SE*

112.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

113.    Based upon information and belief, Defendant slandered Plaintiff by repeatedly calling Plaintiff's current and former students, coworkers, colleagues, and others, and stating that, *inter alia*, Plaintiff was accused of sexual misconduct, that Plaintiff covered-up sexual misconduct and retaliated against students, that Plaintiff was found "guilty" of the same by her employer, and that she is a danger to students.

114.    Defendant's statements were false and Defendant made the statements knowing their falsity, and/or with a reckless disregard for the truth.

115.    Defendant had no privilege to make his false statements.

116.    Defendant acted with actual malice as demonstrated by his dogged persistence in repeatedly calling individuals related to Plaintiff's employment and professional community, over and over again, in order to ensure that he was able to deliver his defamatory message and damage Plaintiff.

117.    As a direct result and proximate result of the false and slanderous statements made by Defendant, Plaintiff has suffered hatred, contempt, scorn, and ridicule.

118.    As set forth above, the statements made by Defendant are slanderous *per se* in that they accuse Plaintiff of having committed a crime and of being unfit to practice in her profession. Moreover, Defendant's acts have caused Plaintiff actual harm in an amount that exceeds $75,000.

119.    The above-detailed actions of Defendant were undertaken not just to harm Plaintiff, but were part of pattern of similar conduct aimed at dozens of individuals and institutions in academia and the scientific community in order to damage an industry that has repeatedly rejected Defendant because of his outrageous and harmful behavior.

## COUNT III - INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

120.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

121.    Plaintiff had agreements with Stanford University and UCLA to perform speaking engagements relating to her anthropological work in Peru.

122.    These speaking engagements presented invaluable opportunities for professional advancement and networking, provided free travel and lodging, and added additional accomplishments for Plaintiff's curriculum vitae and application for tenure.

123.    Based upon information and belief, Defendant was aware of Plaintiff's speaking engagements.

124.    Defendant repeatedly published numerous false and defamatory statements about Plaintiff in various online forums, including a Facebook group called BioAnthopology News, which has 25,001 members (as of June 14, 2020) who work in, or are involved with, Plaintiff's industry.

125.    Defendant also repeatedly called, emailed, and otherwise contacted Plaintiff's current and former students, coworkers, and colleagues, with the intent to malign Plaintiff's professional and personal reputation by sharing false and defamatory information.

126.    Defendant publically called upon Plaintiff's employer to take adverse actions against her based on his false and defamatory allegations, thus suggesting to others in her industry that she should be unwelcome and is unfit to perform her profession.

127.    Defendant acted with actual malice and specifically targeted Plaintiff's employment and professional and contractual relationships.

128.    Defendant's wrongful acts were the actual and proximate cause of Stanford and UCLA cancelling their agreements for Plaintiff to perform speaking engagements.

129.    As set forth above, Defendant improperly interfered with Plaintiff's contracts and prospective economic advantage. Moreover, Defendant's acts have caused Plaintiff actual harm in an amount that exceeds $75,000.

130.    The above-detailed actions of Defendant were undertaken not just to harm Plaintiff, but were part of pattern of similar conduct aimed at dozens of individuals and institutions in academia and the scientific community in order to damage an industry that has repeatedly rejected Defendant because of his outrageous and harmful behavior.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against

Defendant for the following relief:

(a) Compensatory damages in an amount not less than $18 million, along with prejudgement

interest;

(b) Punitive damages in an amount as the Court may see fit to penalize Defendant and to

deter Defendant and others from repeating his unlawful conduct;

(c) An order directing Defendant to remove the defamatory publications and to publish

retractions;

(d) An award of Plaintiff's reasonable attorneys' costs and fees; and

(e) Such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: June 16, 2020                    */s/ David Scher*
Washington, D.C.                         David Scher
                                         Hoyer Law Group, LLC
                                         1300 I St. NE, Ste. 400E
                                         Washington, D.C. 20005
                                         Telephone: (202)-997-8227
                                         Email: dave@hoyerlawgroup.com

26

## **VERIFICATION**

I, Danielle Kurin, am the Plaintiff in the above-entitled action. I have read the foregoing

Complaint and know the contents thereof. The same is true of my own knowledge, except as to

those matters which are therein alleged on information and belief, and as to those matters, I

believe it to be true. I declare under penalty of perjury that the foregoing is true and correct and

that this declaration was executed at Falls Church, Virginia.


DATED: June 16, 2020 _____