# EXHIBIT 1

Case 7:20-cv-04013-VB   Document 1-1   Filed 06/16/20   Page 2 of 15

# Balter's Blog

A blog about politics, science, archaeology, human evolution, jazz, culture, and the meaning of life by Michael Balter, a journalist and journalism professor based in Paris and New York (aka The Blog for People Who Don't Have Time to Read Blogs.)

## Featured Post
### A #STEMToo Rogue's Gallery of sexual harassers, predators, and bullies in the sciences [Continually updated]

Since fall 2015, in collaboration with victims and survivors who have served as primary sources for my stories, I have had the privilege …



## Quotes of the Moment

"*Lying is done with words and also with silence.*" --Adrienne Rich

## About Me

 **Michael Balter**

I have been a working journalist for more than 40 years, beginning in Los Angeles as an investigative reporter and then in Paris as a travel, food, and science writer. For more than 20

## StatCounter

Friday, February 28, 2020

# At UC Santa Barbara and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation against victims [[Updated March 6]]

Danielle Kurin is an anthropological bioarchaeologist at the University of California, Santa Barbara (UCSB.) She conducts most of her field work at archaeological sites around the Peruvian city of Andahuaylas, covering the period from about 200 BC to 1600 AD.

Enmanuel Gomez Choque, Kurin's partner, is a Peruvian archaeologist who has long worked in the



Danielle Kurin

area; he is also the executive director of the Andahuaylas Museum. Until last year, he was also listed as a member of UCSB's Bioarchaeology and Biogeochemistry Lab, which Kurin directs. (He was removed from the lab's Web site shortly after I began to make the inquiries described below.)

On June 14, 2016, UCSB's Title IX office found, based on the standard of a preponderance of the evidence, that Gomez had sexually harassed students working with the couple at the field school they ran in the Andahuaylas region. On the same day, Kurin

6/11/2020 Balter's Blog: At UC Santa Barbara and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation agai…

Case 7:20-cv-04013-VB Document 1-1 Filed 06/16/20 Page 3 of 15

years I have covered anthropology and archaeology writer for Science, Audubon, Scientific American, SAPIENS, and other publications. I have also covered sexual misconduct for The Verge, Scientific American, and others; I write about mental health, especially schizophrenia; and I engage in occasional media criticism. I returned to the USA in October 2017 after 30 years in Paris, and now live in the New York City area, where I currently teach journalism at City College of New York (I previously taught journalism at Boston University and New York University.) For more about me and what I do, copies of my articles, information about my book, and other goodies, please visit MY WEB SITE

View my complete profile

# Subscribe via email

Enter your email address:

Subscribe

Delivered by FeedBurner

# Subscribe Now: Feed Icon

 Subscribe in a reader

# The Goddess and the Bull

was found guilty, under the same burden of proof, of retaliating against students who had filed Title IX complaints against Gomez. She had been placed on administrative leave the previous April, and remained on leave for a total of three years, according to sources inside and outside the UCSB anthropology department.

During the investigation, and even now, the faculty of the UCSB anthropology department have been kept largely in the dark about the allegations, the investigation, and the findings. That made it impossible for them to have any input into Kurin's status in the department and decisions about her academic future.

Last September, I was contacted by a source familiar with these events. The source told me that victims of the misconduct by Gomez and Kurin--along with other archaeologists who were friends of the victims--were concerned that Kurin had recently returned to teaching at the end of her administrative leave, and also that she was reportedly now up for tenure. The concern was greatly amplified by the fact that Gomez and Kurin were still recruiting students from UCSB and other universities to work with them at Andahuaylas. The sources were afraid that female students might be in danger of sexual harassment, and even sexual assault, at the hands of Gomez, and that something needed to be done about it.

Shortly after learning of these allegations, I submitted a California Public Records Act request for all documents in UCSB's possession related to these allegations. In the meantime, I began my own investigation, speaking with numerous witnesses and other sources. It turned out that the alleged misconduct by Gomez had begun much earlier than the events UCSB investigated, and included at least two cases of sexual assault. The same was true for Kurin's habitual efforts to cover up Gomez's misconduct and to threaten students and other witnesses likely to report them. Some sources told me that Kurin often invoked the name of her father, Richard Kurin, a powerful and well known figure at the Smithsonian Institution. Kurin allegedly implied that her father would interfere with the student's careers if they spoke out or made complaints.

On February 20 of this year, UCSB finally gave me a redacted version of the 50 page investigative findings against Gomez and Kurin. Those findings, along with the results of my own reporting on these events, form the basis of what follows. (I reached out to Kurin to comment for this story, but she did not respond. Gomez's responses to the allegations are described below.)

Enmanuel Gomez Choque: Accusations of sexual harassment and sexual assault.

6/11/2020 Balter's Blog: At UC Santa Barbara and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation agai…

Case 7:20-cv-04013-VB Document 1-1 Filed 06/16/20 Page 4 of 15



My book about Neolithic Catalhoyuk in Turkey and the origins of civilization, the paperback edition. For more information about it, please visit MY WEB SITE

# Blog Archive

▼ 2020 (6)
  ► May (2)
  ► April (1)
  ► March (2)
  ▼ February (1)
   At UC Santa Barbara and in Peru, an archaeological...
► 2019 (37)
► 2018 (16)
► 2017 (10)
► 2016 (22)
► 2015 (5)
► 2014 (3)
► 2013 (1)
► 2012 (2)
► 2011 (48)
► 2010 (46)
► 2009 (195)
► 2008 (268)

# Sitemeter



Enmanuel Gomez Choque

The 50 pages of investigative findings from UCSB are redacted in parts, mostly to shield the names of victims and witnesses. Yet while Gomez's name is not redacted, the university somewhat foolishly redacted Kurin's name throughout. I say foolishly, because both the context and my own corroborative reporting make clear in every one of hundreds of instances of redaction that Kurin is being referred to.

The events covered by the Title IX investigation took place during the 2015 field season at Andahuaylas. A number of students had complained that Gomez's actions that season "created a hostile and learning and working environment for the female participants, several of whom are current UCSB students," the report states. At least one other complainant was a student from a university in another state; although that university is named in the report (and also in court papers from a lawsuit Kurin filed against the university when it failed to promote her), the student in question has requested that the university not be identified to protect her privacy. I have agreed to do so.

There were several allegations against Gomez: That he had engaged in inappropriate sexual behavior with a female student at a dance club, including forcibly kissing her; that he had made inappropriate sexual jokes in front of the students; and that he had engaged in sexually hostile behavior against a female student during a trip to a pilgrimage site. The allegations also included charges that Gomez had tried to get the female students to adopt "sexy poses" so that he could photograph them.

My own reporting revealed allegations outside the scope of the Title IX investigation, that Gomez had sexually assaulted at least two students during other field seasons. To protect the identity of these victims, with whom I discussed the allegations directly, I am not giving details of those sexual assaults at this time.

While Kurin eventually declined to cooperate with the Title IX investigation, Gomez did attempt to defend himself, submitting statements to the investigators claiming that he had not engaged in the alleged behavior, and that the alleged victim of the forcible kiss had actually tried to kiss him instead and he had turned his head to avoid it. Gomez also claimed that the accusations of sexually inappropriate jokes were misunderstandings based on a differences of language and culture between him and the female

6/11/2020                    Balter's Blog: At UC Santa Barbara and in Peru, an archaeological couple accused of ongoing sexual misconduct and retaliation agai…

Case 7:20-cv-04013-VB   Document 1-1   Filed 06/16/20   Page 5 of 15

students (as described below, Kurin would later claim that the allegations arose because the students were racist "gringas" out to get her and Gomez for reasons that remained unclear.)

The allegations against Gomez were based on eight witnesses. On page 27 of the report, the investigators conclude that the accusations, based on a preponderance of the evidence, were "substantiated."

**Danielle Kurin: Accusations of retaliation against students who filed Title IX complaints.**

As mentioned above, one of the students who filed a Title IX complaint was from a university in another US state. After Kurin became aware of the complaint, she sent an email to the student asking for the name of the chair of her anthropology department, where the student was working on her PhD. "I'm planning on sending some correspondence his/her way regarding your work on the project," Kurin wrote. Authorities at the out of state university immediately became suspicious, in part because it was very easy for Kurin to figure out who the chair of the department was simply by Googling, if she did not already know. The authorities shared their concerns with counterparts at UCSB, including the chair of the UCSB anthropology department, who at that time was Stuart Smith (Smith, contacted by email, declined to comment.)

In a later, lengthy email, Kurin accused the student of making "outright fabrications" to her professors and told her that she had retained legal counsel "regarding some of the more slanderous and defamatory accusations..." Kurin concluded by writing that "Bioarchaeology and forensic archeology are small fields and your achievements will certainly precede you."

Another witness, identified as Witness 6, told investigators that Kurin had pressured her to tell Kurin everything she knew about the accusations against her and Gomez. According to Witness 6, Kurin said that if she didn't tell her everything she knew, the student would be forced to tell Kurin's lawyer. In addition, according to Witness 6, Kurin stated that if she and Gomez were fired from UCSB all the work at Andahuaylas would stop and the UCSB bioarchaeology lab would shut down. The implication was that none of the graduate students involved in the work would have PhD projects if they pursued the complaints. Kurin also told Witness 6 (and, in similar words, other students) that she and Gomez would "sue everyone who got us into this mess."

Another witness, identified as Witness 2, told investigators that Kurin had put very similar pressure on her and that she was very afraid of retaliation. The investigative report describes the extremely upset emotional state, including profuse tears, of the witnesses as they talked to investigators about what had

6/11/2020 Balter's Blog: At UC Santa Barbara and in Peru, an archaeological couple accused of ongoing sexual misconduct and retaliation agai…

Case 7:20-cv-04013-VB Document 1-1 Filed 06/16/20 Page 6 of 15

happened. Several other witnesses testified along similar lines about their fears of retaliation by Kurin.

On another occasion, according to the Title IX investigation, Kurin texted everyone in her lab asking them what they knew about the allegations against her and Gomez.

On page 50 of the report, the Title IX investigators find that the claims of retaliation by Kurin had been substantiated.

**The evidence seems clear that Kurin and Gomez are a continuing danger to students.**

As I mentioned above, before receiving the Title IX findings earlier this month, I spoke with a large of number of sources including numerous direct witnesses to the events covered by the university's own investigation, as well as other episodes that it did not cover. To protect the identity of those witnesses, who still fear retaliation by Kurin and other archaeologists who might be sympathetic with her, I am not giving details of their personal situations. But everything in this report is based either on the Title IX report or direct discussion with sources; no second hand information or rumors were considered without full corroboration, as is normal journalistic practice.

Some additional context which I hope will be helpful to the archaeological community and Kurin's UCSB colleagues:

--One of the cases of sexual assault by Gomez I describe above has been corroborated by numerous other witnesses, including colleagues in the US the victim contacted immediately after it happened. This serious accusation was outside the scope of the Title IX investigation for reasons I must leave undiscussed, to protect the victim.

--I shared the Title IX report with some of the witnesses so they could comment on it, especially the defense that Gomez mounted and the declarations that he submitted (Kurin did not cooperate with the investigation.) Gomez told investigators that the women at the site were constantly trying to get him to provide them with alcohol and take them dancing.

"While I never expected Danielle or Manuel to be truthful, the blatant lies throughout are really shocking," one student told me. Gomez "purchased an entire carton of beer and was enthusiastically trying to ply us all with alcohol the entire night, despite many of us declining and stating we did not want to drink more. He was upset we were refusing the alcohol and said it was disrespectful."

--A student who had known Kurin during a period preceding these events told me that her use of the name of her father, Richard Kurin of the Smithsonian Institution, to threaten others with

6/11/2020                    Balter's Blog: At UC Santa Barbara and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation agai…

Case 7:20-cv-04013-VB   Document 1-1   Filed 06/16/20   Page 7 of 15

retaliation had a long history. A member of the UCSB anthropology department told me that colleagues widely discussed their understanding that Richard Kurin had put pressure on the university. While I have not found any direct evidence that Kurin actually did intercede, Danielle Kurin's earlier threats to use her father as a cudgel made colleagues believe that he had. (R. Kurin did not respond to multiple requests for comment.)

--In Facebook posts since deleted, Kurin accused the complaining students of racism, a charge that both she and Gomez would repeatedly make over the course of these events. In one such Facebook post, Kurin referred to the "unyielding, unwarranted, and racially-tinged actions and attitudes of a few culturally-insensitive, but nevertheless powerful, privileged American students, scholars, and staff on a 'sanctuary' campus."

In another Facebook post, Kurin claimed that the students had mocked Gomez and taken photos of him while he was asleep by a riverbank. "Upon being warned that their egregious behavior could be reported to their respective universities," Kurin wrote, "this group of participants admittedly colluded to proactively file a number of false complaints involving alleged harassment, retaliation, and other forms of misconduct against myself, Manuel, the Gomez family... and others." In the same post, Kurin says that she and Gomez were banned from the UCSB campus in spring of 2016 (corresponding with the leave of absence) shortly after the couple were married in Santa Barbara. "He was informed that his 'latin' and 'indian' manners made people 'uncomfortable' and for that was banned from the campus of a public university." (In my own reporting, I have not found anyone to confirm that these statements were made.)

--Last week, I received an anonymous email from an ally of Gomez, responding to social media posts I had made in anticipation of this report. The email defended Gomez and stated that he was the victim of racism by the American students. Attached were declarations, heavily redacted, which I took to be statements submitted to the UCSB authorities during the Title IX investigation, but which were not included in the files given to me by the university. They were basically character witness statements, which also denied that Gomez had harassed anyone or behaved inappropriately. I asked the email writer to identify themselves or to otherwise authenticate these declarations, but so far have received no response. Until they can be authenticated, I will not reproduce them here.

--In November 2016, several months after the June 2016 Title IX findings, Kurin filed suit against UCSB in the California courts, arguing that she had been unfairly denied a promotion and salary increase (while she was on administrative leave, she was not fired.) The following April, the court ruled for the Regents of the University of California and further actions on the lawsuit were taken off of the court calendar.

Case 7:20-cv-04613-VB   Document 1-1   Filed 06/16/20   Page 8 of 15

As I mentioned above, over the course of several years now, members of Kurin's anthropology department at UCSB have either been kept in the dark about the allegations against her and the Title IX findings, or prohibited by the university from discussing them with others. "There was complete silence by the administration," says one faculty member, adding that "it was extremely frustrating to be kept so wholly out of the loop." Indeed, most of Kurin's victims feel that her threats of retaliation against them were so clear and unambiguous that she should have been fired at the end of the Title IX investigation. The university declines to comment on the case, so its reasons for not doing so cannot be reported here; nevertheless, it is unfortunately common practice for institutions to protect their own reputations at the expense of student safety.

But isn't it pathetic that most members of a university department have to find out the details of misconduct findings from a reporter, rather than from their own institution? Who does that help in the end? Certainly not the institution's reputation, which it worked diligently but ultimately unsuccessfully to protect.

Now that Kurin is off administrative leave and back to teaching in the department (a fact confirmed by both the course schedule and a university spokesperson), Kurin appears to be trying to convince her colleagues that she has seen the error of her ways. "She is saying all the right things now," one colleague tells me. For example, she is telling department members that she and Gomez are now divorced; however, other sources tell me that as of several weeks ago, Kurin was still working with Gomez at Andahuaylas and still living with him in the house the couple occupies there.

Some colleagues have privately suggested to me that Gomez has had a "bad influence" on Kurin, and indeed a couple of archaeologists who have known Kurin for a long time told me that she had changed for the worse after she met him. I do not claim to be privy to the dynamics of their relationship; but I think many today, in this so-called "#MeToo Era," would not consider them to be exculpatory of Kurin's clear acts of retaliation against students who were trying to become archaeologists and never asked to be harassed or assaulted.

It remains to be seen whether Kurin will be given tenure, and whether, now that the truth about the couple and their actions has been revealed in this provisional report (there is more to come), she will continue to have a career at UCSB. However, there are already signs that the archaeology community is frowning on her history of enabling sexual misconduct and retaliating against students. Kurin was scheduled to speak about her research earlier this week at Stanford University's Archaeology Center; but upon learning of the allegations against her, colleagues there cancelled her talk.

6/11/2020                    Balter's Blog: At UC Santa Barbara and in Peru, an archaeological couple accused of ongoing sexual misconduct and retaliation agai…

Case 7:20-cv-04013-VB   Document 1-1   Filed 06/16/20   Page 9 of 15

As I have argued in other reports of this type, serious consequences are necessary if #MeToo and bullying abuses are to be stamped out and the culture is to be changed. I will update this report as new information becomes available and/or as witnesses feel encouraged to speak out publicly.

**Afterthoughts, March 1, 2020:**

Is there something odd about the facts related above? Note while members of the UCSB anthropology department were kept in the dark about this situation--with the possible exception of the department chairs--I was able to get the 50 pages of investigative records via the California Public Records Act. Any citizen can do this. But it's routine for institutions to caution everyone in academic departments that everything must be kept confidential, and only administrators (deans, etc.) are privy to the information. A similar situation unfolded in the case of archaeologist Deanna Grimstead at Ohio State University: Anthropologists there were kept ignorant about the allegations of sexual harassment against her and the findings of the Title IX investigations into them. (I hope it was just a coincidence that these records were released in the cases of accused women.) Yet again, I was able to obtain those documents through Ohio's Public Records Act.

The question arises whether academics are truly barred from knowing what is going on in their own departments, and how their own students have been affected, or whether they are simply too quick to accept what they are told about the necessity of secrecy. While there are concerned faculty members who do try to protect students, over 4+ years of covering #MeToo cases I have found that they are very much in the minority. Sad to say, the overwhelming majority of academics are happy to find excuses to stick their heads in the sand and pretend it is not their business. This is a real betrayal of students who come to them, enthusiastic about their studies and the possibilities of having careers in their chosen fields. Even worse, it many cases it smacks of pure complicity. This must stop if the culture of abuse is to change.

**Update March 6, 2020: New allegations of sexual assault by Gomez and attempted coverup by Kurin at the 2018 field school at Wari, Peru.**

After the publication of this preliminary report a week ago, I was contacted by a number of students who had participated in Kurin's field school at the site of Wari in Peru. Two of them told me of being sexually assaulted by Gomez during the 2018 season, two full years after the Title IX findings described above. The students also detailed, including in audio recordings they had made of the events, Kurin's attempts to mollify the students and cover up for Gomez's behavior. Kurin's statements to the students went back and forth between pleading with them for understanding, attacking them for their own behavior, and lying about the earlier

6/11/2020 Balter's Blog: At UC Santa Barbara and in Peru — an archaeological contractor accused of engaging in sexual misconduct and retaliation agai…

Case 7:20-cv-04613-VB Document 1-1 Filed 06/16/20 Page 10 of 15

Title IX findings (Kurin told the students that they had been "investigated and resolved.")

I am still talking with these sources and will be reporting this new evidence in detail next week. Meanwhile I am reproducing here an email I sent this morning to a member of the UCSB anthropology department, one of several members of that department I have been talking to in confidence. In what follows, IFR stands for the [Institute for Field Research](), which sponsors field schools in archaeology and other areas throughout the world. Willeke Wendrich, whom I have known for a number of years, is the chair of IFR's board of governors.

Hi _____,

After now talking with about a half dozen of the 2018 field school students and TAs, including almost everyone who was involved in trying to get Danielle to take responsibility for what happened towards the end of that season, I am having second thoughts about encouraging them to file Title IX complaints with UCSB. Here are my reasons:

1. Almost all of these new sources contacted me after they saw my blog post about the 2016 Title IX findings. They were amazed, to say the least, that the university has allowed Danielle to return to work, thus resulting in considerable trauma and stress for them and--in a few cases--considerable alterations to their lives and careers (in one case, quitting archaeology entirely.)

2. Their anger at UCSB is compounded by the actions of IFR, which I have documented, including direct communication with Willeke Wendrich about this. The organization at first dismissed their concerns, and only after the students' insistence conducted an investigation. While IFR did end their sponsorship of the field school as a result, they broke their promise to give the results of the investigation to the students, and they are refusing to share it with me.

3. The students feel very let down, and, in what they see as a last resort, they have turned to a journalist to help get their stories out. As you know, this is almost always the reason that victims and survivors contact me; I am never their first choice. They contact me when they have lost hope that the system will protect them.

Under these circumstances, I can't in good faith suggest to them that they contact UCSB in hopes that some kind of justice might be done here, and that UCSB would do the right thing--having already done the wrong thing, demonstrably.

As you also know, my #MeToo reporting is an example of a long and proud tradition in journalism, called advocacy journalism. Practitioners of this kind of journalism use exactly the same standards of proof, accuracy, and ethical reporting that all other journalists do; but they go further and draw conclusions about what measures should be taken as a result of their reporting.

I do not know where things are right now with Danielle's efforts to get tenure, but I hope you will tell me that, in confidence. But my position as the reporter on this story is that Danielle should be terminated, based on the earlier Title IX findings, without any further official proceedings. It is my hope that my reporting on the 2018 events, which I will do publicly next week, will help convince the department and the university that they must take this course.

In contrast to our earlier communications, I would encourage you to share this one with as many colleagues in your department as you feel comfortable doing, including the department chair.

6/11/2020 Balter's Blog: At UC Santa Barbara and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation agai…

Case 7:20-cv-04613-VB Document 1-1 Filed 06/16/20 Page 11 of 15

I look forward to hearing from you further, and I greatly appreciate your own commitment to the safety of our students and young researchers.

Best wishes,

Michael

Just one more thought about all this for now. Members of the UCSB anthropology department have complained to me privately, and rightly, that **the administration kept them in the dark** and insisted that the disciplinary proceedings against Gomez and Kurin had to be kept secret. So then, nearly four years later, **an outside journalist comes onto the scene** and makes a straightforward California Public Records Act request and **gets all the findings.** Why couldn't anyone in the department do that? What were they afraid of? It seems that no one wanted to rock the boat, or worse, no one really wanted to know. With that lack of knowledge, otherwise well intentioned colleagues **absolved themselves of all responsibility.** This is the **head in the sand attitude** that must stop if students and others are to be fully protected from sexual predators and their enablers.

**Further update on IFR's role:**

After today's update was published, I received the following email from Willeke Wendrich, the chair of IFR's board of governors:

> Michael,
> I am thoroughly disappointed with your lack of journalistic ethics. You are publishing falsehoods. IFR was not aware of any title IX investigations and accusations prior to the 2018 field school. I made this very clear in our email conversation.
> Willeke

What's odd about this email is that I had not yet published any claims that IFR was aware of the 2016 Title IX cases. I was planning to include Wendrich's denial that they knew--stated in email correspondence between us earlier this week--in a planned update in the coming days. But in fact, my sources tell me that **IFR leaders almost certainly did know**, because a member of the IFR board (someone who would have been very aware of rumors circulating in the Andean research community) was informed about it at the time. I have always known Willeke to be an honorable person, so I have to consider the possibility that she was misled by her colleagues, including IFR executive director Ran Boytner, who has ignored all of my requests to speak with him about this. I will have more to say about IFR's role next week, and questions about **the role that UCSB Executive Vice Chancellor David Marshall may have played** in returning Kurin to teaching

6/11/2020 Balter's Blog: AT UC Santa Barbara and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation agai…

Case 7:20-cv-04613-VB Document 1-1 Filed 06/16/20 Page 12 of 15

despite all of the above.

**Update March 11, 2020**: I have now published a new report based on misconduct that occurred at Kurin's and Gomez's 2018 field school in Peru.

Posted by Michael Balter at 11:32 AM 

### 6 comments:

**Oliver said...**

Dear Michael

What I find odd is that there was a three year leave of absence and none of the other faculty members in that department suspected anything? What am I not getting here?
Or is this a normal thing for a prof to be three years on leave of absence?
Keep up the good work. Tenure should be denied in this case.

Oliver

March 8, 2020 at 5:58 AM

 **Michael Balter** said...

6/11/2020 Balter's Blog: At UC Santa Barbara and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation agai…

Case 7:20-cv-04613-VB Document 1-1 Filed 06/16/20 Page 13 of 15

Oliver, thanks for your comment.

It's not so much that the faculty members did not suspect anything, its that the university did not want them to know what had happened. Kurin had sued the UC regents for denying her a promotion, amazingly enough, and institutions always try to protect their reputations—even at the expense of students who become future victims. That clearly happened in this case, and the university is fully to blame. Nevertheless, faculty members should not accept secrecy in such cases, as a matter of their duty of care to their students.

March 8, 2020 at 6:55 AM

**Anonymous said...**

Michael, as an archaeologist who works in the Andes, I find IFRs denial about knowing about Kurin's past actions to be unbelievable. Many of us were SHOCKED to see she had been hired to work on the Wari field school (that year IFR was also advertising a field program run by Kruin that was later cancelled, https://ifrglobal.org/wp-content/uploads/2018/01/Syllabus-Peru-Sondor-2018.pdf). Furthermore, IFR had run programs with Kurin previous years and it is ridiculous to suggest they had no knowledge of these allegations.

March 9, 2020 at 1:02 PM



**Michael Balter** said...

Thank your comment. Yes, not only is it unbelievable that IFR did not know, but I actually now have convincing evidence that they did know. One of their board members was pointedly warned after the June 2016 Title IX cases against Kurin and Gomez, and it is not credible that he would have withheld that information from Ran Boytner and Willeke Wendrich. I have asked that board member to comment on the situation, but so far (and after nudges) he has not responded. That does not bode well.

I am also interested in learning more about how IFR is set up including the financial entanglements. It runs a lot of field schools in a lot of different countries and

6/11/2020 Balter's Blog: AT UC Santa Barbara and in Peru, an archaeological couple accused of engaging in sexual misconduct and retaliation agai…

Case 7:20-cv-04613-VB Document 1-1 Filed 06/16/20 Page 14 of 15

the students pay a lot of money to attend them. Anyone with thoughts on that is welcome to get in touch.

March 9, 2020 at 1:08 PM

**Anonymous said...**

Existe un dicho popular en el Perú que es muy cierto: EL QUE ESTA ACOSTUMBRADO A DELINQUIR, SIEMPRE VOLVERÁ A SERLO.
Este Sr. Gómez, fue sentenciado y estuvo en cárcel en el Perú por los delitos de violación sexual previo uso de drogas contra varias estudiantes de la Universidad San Cristóbal de Huamanga donde estudiaba. Saco de manera fraudulenta su Título profesional con ayuda de sus cómplices que existían en la universidad. Y ahora sigue en las mismas actitudes delincuenciales. Este delincuente y su pareja, deben ser no solo separados de las instituciones donde trabaja, también debería podrirse en la cárcel pagando todos sus delitos que siempre estuvo acostumbrado a realizarlo. Porque es un peligro para las jóvenes estudiantes

June 7, 2020 at 12:10 PM



**Michael Balter said...**

Google translation of the above comment:

There is a popular saying in Peru that is very true: THE ONE WHO IS USED TO DELINQUIRING, WILL ALWAYS BE AGAIN.
This Mr. Gómez, was sentenced and was imprisoned in Peru for the crimes of sexual rape prior to drug use against several students from the San Cristóbal de Huamanga University where he studied. I fraudulently obtain his professional title with the help of his accomplices who existed at the university. And now he continues in the same criminal attitudes. This criminal and his partner, should not only be separated from the institutions where he works, he should also rot in jail paying for all his crimes that he was always used to doing. Because it is a danger to young students

June 7, 2020 at 12:17 PM

Post a Comment

## Links to this post

Case 7:20-cv-04613-VB   Document 1-1   Filed 06/16/20   Page 15 of 15

**Create a Link**

Newer Post    Home    Older Post

Subscribe to: Post Comments (Atom)