IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------

DANIELLE KURIN,

Plaintiff,

                                              JURY TRIAL DEMANDED

v.


MICHAEL BALTER,                        Case No. 7:20-cv-4613

Defendant.


--------------------------------------------------------------------

DEFENDANT'S ANSWER TO FIRST AMENDED COMPLAINT


Defendant Michael Balter **denies each and every allegation in the First Amended Complaint**, as specified and detailed in sections 1 through 164 below, except where he has indicated that he agrees with factual statements that are not in contention in this litigation.


AFFIRMATIVE DEFENSES

   A.  <u>First Affirmative Defense (Failure to state a claim.)</u> The Amended Complaint, in whole or in part, fails to state a claim upon which relief can be granted.
   B.  <u>Second Affirmative Defense (Truth):</u> All alleged defamatory statements made by Balter are true or substantially true (and thus treated as true.)
   C.  <u>Third Affirmative Defense (Opinion):</u> All alleged defamatory statements made by Balter that are not true or substantially true are protected as opinion.
   D.  <u>Fourth Affirmative Defense (Lack of actual malice, gross irresponsibility, or negligence)</u>: Defendant Balter did not act with actual malice, gross irresponsibility, or negligence.
   E.  <u>Fifth Affirmative Defense (Common Interest Privilege)</u>: Plaintiff's claim for defamation against Defendant Balter is barred in whole or in part under the common interest privilege because Balter provided the information and commentary to others who share a common interest in knowing the information.
   F.  <u>Sixth Affirmative Defense (Freedom of Speech Privilege)</u>: Plaintiff Kurin's claim for defamation against Defendant Balter is barred in whole or in part as privileged under the First and Fourteenth Amendments to the Constitution of the United States and under Article I, Section 8 of the New York State Constitution.

G. <u>Seventh Affirmative Defense (Incremental Harm)</u>: Plaintiff's claim for defamation against Defendant Balter is barred in whole or in part because because any defamatory statement by Defendant Balter imposes no incremental harm to Plaintiff from injuries she has already suffered due to her own demonstrable record of misconduct.

H. <u>Eighth Affirmative Defense (Failure to mitigate)</u>: Any damages Plaintiff allegedly incurred are the result of Plaintiff's own actions and failures.

I. <u>Ninth Affirmative Defense (Contribution)</u>: Plaintiff's claims are barred and/or reduced, in whole or in part, by her own wrongful conduct.

J. <u>Tenth Affirmative Defense (Right to add additional defenses)</u>: Defendant Balter reserves the right to assert any additional defenses which might come to his attention or might develop during the pendency of this action.

## THE HISTORY AND BACKGROUND OF THIS LITIGATION

In September 2019, Michael Balter, the defendant in this litigation, was contacted by an archaeologist and asked to look into allegations of misconduct by University of California, Santa Barbara archaeologist Danielle Kurin. The archaeologist contacted Balter on behalf of a small group of colleagues who were concerned that Kurin was returning to work at UCSB after a three year administrative leave. They chose to contact Balter because, as a journalist with 42 years of experience, he had in recent years gained a reputation as a "#MeToo reporter," focusing on misconduct in academia. The archaeologists had direct contact with at least one student who said she had been sexually assaulted by Kurin's partner and later husband, Peruvian archaeologist Enmanuel Gomez Choque. Balter was also told that Kurin had been investigated by UCSB and placed on administrative leave as a result, although they did not have all the details.

The archaeologists were concerned that with Kurin's return to work at UCSB, as they put it to Balter, she was still a "danger to students" because she had retaliated against students who reported Gomez for sexual harassment under the rubric of Title IX of the U.S. education laws. They were worried that Kurin would continue to recruit students to the field school in Peru where the assaults and harassment took place (at the time they contacted Balter, September 2019, Kurin was still married to Gomez, although a divorce was pending.)

Balter agreed to investigate the claims. Over the next several months, he interviewed many witnesses, and established that the allegations were substantially true. He also made a request, on September 18, 2019, to UCSB for the Title IX documents and any other misconduct investigations of Kurin and Gomez under the California Public Records Act. Balter received those documents on February 18, 2020. Beginning in January, he began to ask Kurin, by email, to respond to the allegations and to accord him an interview to discuss them and provide her side of the story. Balter made a total of four such email requests between January and March; Kurin did not respond to any of them.

In February 2020, and again the following month, Balter published extensive reports, thoroughly documented and including a large number of witness interviews, about his findings. Balter has continued to publish updates, including about alleged abuses of students by Kurin at UCSB itself

even before the Title IX proceeding referenced above, to the present day. All of this alleged misconduct took place before Balter first learned of Kurin's existence in September 2019, and had already caused considerable harm to Kurin's reputation and standing in the academic community without any action or input from Balter.

In June 2020, Kurin sued Balter for defamation, alleging that he had defamed her, acted with malice and reckless disregard of the facts. In the Answer below, Balter rejects and denies each and every allegation against him. Balter further believes that this litigation is brought frivolously and with the intent to mislead this Court, and that it's real purpose is to attempt to silence Balter's reporting as Kurin goes up for tenure at UCSB beginning in September 2020. Balter also believes that this lawsuit is not just intended to silence Balter's protected journalism under the First Amendment of the U.S. Constitution, but also intended to intimidate and silence victims and survivors of her proven misconduct. Finally, Balter believes that Kurin is hoping to also intimidate her colleagues in the UCSB anthropology department, and the university itself, into giving her tenure despite her long record of demonstrated misconduct, including retaliation against and abuse of students.

In her Complaint, Kurin actively seeks to hide from this Court key facts that would allow it to fairly evaluate her claims, including the documented fact that she was found to have committed misconduct by her own institution in 2016. In this Answer, Defendant Balter seeks to set the record straight, and asks the Court to rule against the Plaintiff on all matters in dispute.


INTRODUCTION

1. Plaintiff Kurin states that Defendant Balter owns and operates a blog and she provides the URL for it. This statement is true. Defendant Balter, a reporter with 42 years of experience working for major publications, often uses his blog to write about topics that interest him, as is typical of most bloggers, including journalists who also blog on the side. However, over the past few years, Balter has used his blog to publish his reporting about misconduct in academia, because he finds that this publishing format is most suitable to doing what is often called "#MeToo journalism." Last year, Balter published an article in the *Columbia Journalism Review (CJR)*, the number one journalism magazine in the United States (published by Columbia University), in which he explained at length why he had made the choice to publish his #MeToo journalism on his blog, after a couple of years of doing it for major publications like *Science*, *The Verge* (Vox media), and *Scientific American*. That article can be found at https://www.cjr.org/opinion/metoo-academia-sexual-assault-harassment.php. The editors of CJR were very intrigued by this approach to doing serious journalism and published the article because they thought it would be of interest as CJR's very broad readership of journalists and scholars. Kurin also states that Balter has "myriad social media presences." This statement is inaccurate and very misleading, because the word "myriad" is usually defined to mean a very large number. In reality, Balter posts on his blog, Twitter, and Facebook. He does not use

other social media platforms except in very rare instances. In making this misleading statement, it appears that Kurin wishes to prejudice the court into accepting the statements she makes in the next section, in which she begins to attempt to portray Balter as something other than a real and serious journalist.

2. Plaintiff Kurin says that Defendant Balter "proclaims" to be a #MeToo reporter. This statement is false, misleading, and again represents an attempt to prejudice the court against an established and reputable journalist. Balter's status as a #MeToo reporter is based on his actual history and practice as a reporter, not on proclamations. During the past five years, Balter has investigated dozens of cases of misconduct and wrongdoing, using the standard techniques of journalism which require corroboration for all statements made except where they are clearly stated as opinion (which is allowed in modern journalism.) In nearly all of these cases, the allegations have not only turned out to be correct, but have led to termination or forced resignation of the accused abusers. As Kurin points out elsewhere in her Complaint, Balter maintains a roster of his investigations on the home page of his blog, which can be found at http://michael-balter.blogspot.com/2018/12/sexual-abusers-i-have-known.html. Kurin further states that Balter is an "internet vigilante" who exploits victims of sexual abuse to enhance his own reputation. These statements are false, and Kurin provides absolutely no evidence whatsoever, here or anywhere else in her Complaint, for this highly prejudicial interpretation of Balter's motives. In a recent interview with an organization devoted to protecting students and other researchers engaged in field work, Balter discussed his motivations and the history of his involvement in #MeToo reporting at length. This is the best source of accurate information about his motivations: http://michael-balter.blogspot.com/2020/06/the-confessions-of-metoo-reporter.html

3. Plaintiff Kurin states that Balter uses his blog as a "bully pulpit" to "negligently, maliciously, and recklessly" publish stories that are often false, and that his motives for doing so are personal fame and aggrandizement. Again, these statements are totally false and designed to prejudice the Court against Balter's dedicated work as a journalist trying to help victims of abuse find ways to tell their stories. Kurin is clearly hoping that by painting such a false and injurious portrait of Balter and his motives, the Court will consider that these alleged motivations apply to his reporting about Kurin's misconduct as well. This dishonest attempt to deflect from the actual facts must fail.

4. Plaintiff Kurin alleges that Balter "doxes" individuals that he is investigating and has published their home addresses and bank records. In only one case has Balter published such information about a subject of his reporting, under circumstances that were journalistically justified. The information published did not relate to a sexual misconduct investigation but to entirely different matters. Again, Kurin seeks to mislead the Court about Balter's character and falsely portrays him as an unethical journalist.

5. Plaintiff Kurin says that Defendant Balter portrays himself as a "journalist and journalism professor," putting those terms in quotes as if there is some question whether they are accurate. In fact, Balter is a journalist and a journalism professor, full stop. He began his journalism career in Los Angeles in 1978, as a reporter at KPFK radio, and later began work as a freelance writer for the *L.A. Weekly, the L.A.*

*Reader, the Los Angeles Times*, and *Los Angeles Magazine*. In 1988 Balter moved to Paris, where he engaged in food, travel, and political writing for the *International Herald Tribune, Travel and Leisure, Islands magazine, Bon Appetit, Saveur*, and other publications. In 1991 he became the Paris correspondent for *Science*, a position he held for 25 years. More recently Balter has written for *National Geographic, Smithsonian, Discover, Scientific American, The Verge*, the *Columbia Journalism Review, SAPIENS, Audubon*, and other publications. Likewise, Balter has taught journalism at Boston University, New York University, and the City College of New York. Kurin also states that Balter publishes embellished and false stories. This is untrue. Throughout his career, Balter has followed the highest standards of journalism and journalistic ethics, and has continued to use those standards in his #MeToo reporting. For example, during the 25 years that Balter worked for *Science*, the journal was obliged to publish no more than a half dozen very minor corrections to his reporting, way below the average for that and most other publications. Finally, Kurin's statement that academia and science have rejected Balter are blatantly false, and Kurin provides no evidence for her false statement.

6. Plaintiff Kurin states that Defendant Balter admits to playing "fast and loose" with his reporting, citing the *Columbia Journalism Review* article referred to above. Balter admits to no such thing, and Kurin is clearly hoping that the Court might not read every reference in her Complaint and thus not recognize the blatant falsehoods represented by this statement and so many others. Nowhere in that article does Balter say that he does not accept the high journalistic standards of mainstream publications; moreover, Balter's reference to possible legal liability refers not to any faults with his reporting, but to the fact that writing about controversial subjects such as #MeToo cases is risky, and that accused individuals sometimes bring lawsuits against journalists who are simply doing their jobs and reporting the truth. The current litigation brought by Kurin is an excellent example of this.

7. Plaintiff Kurin states that Defendant Balter acts as "judge and jury" in his reporting and implies that he simply proclaims accused individuals "guilty" based on his own whims and prejudices. Kurin also says that Balter concludes that some accused abusers are culpable "in the face of contrary findings by official bodies." These statements are false. As stated above, Balter follows the same journalistic methods, in which he has 42 years of experience, used by mainstream publications including the *New York Times* and his former employer *Science*. What seems to rankle Kurin is that Balter often draws conclusions about the behavior of his reporting subjects and advocates certain measures be taken (such as, in her case, the denial of tenure at her institution, the University of California, Santa Barbara.) But Balter's work is in the fine and proud tradition of "advocacy journalism," long an important part of American journalism, in which the reporter is allowed to express their opinion about what measures should be taken as long as the reporting is sound, accurate, corroborated, and fair. For example, Balter repeatedly asked Kurin, in a series of emails, to comment on his findings and provide input into his reporting, including offering alternative interpretations to his own. Balter even offered to add in her comments after publication of his reports, to no avail. Kurin's attorney is on the record as stating that she received these requests, but she did not respond to them. Finally, it is true that Balter and other #MeToo reporters have, at times, found that the

conclusions of "official bodies" (often universities investigating Title IX cases) are wrong and sometimes reflect efforts to protect institutions over victims and survivors. Many celebrated #MeToo cases have involved just such institutional failures.

8.  Plaintiff Kurin states that Balter has commented on Twitter (and elsewhere) that he has been unable to obtain libel insurance for his reporting. This is true. Kurin further states that the reason is the "content" of his reporting. In this statement, Kurin is attempting to mislead the Court into thinking that Balter's difficulties in getting liable insurance are due to falsehoods in his reporting. This is untrue. Balter has made it clear that insurance underwriters often do not want to cover content that is risky and controversial, regardless of its veracity. This is an ongoing problem in journalism today, and most journalists agree that the failure of insurance companies to spread the risk appropriately has a chilling effect on reporting on controversial subjects.

9.  Defendant Balter denies that he has ever published any libelous statements about Plaintiff Kurin on his blog or anywhere else. Balter stands by the accuracy of his reporting in all instances. Balter agrees that Kurin is an assistant professor at UCSB and directs the bioarchaeology lab there.

10. Plaintiff Kurin makes the following statement: "Balter's false and defamatory statements include alleging that Kurin was accused of sexual misconduct, that Kurin covered-up sexual misconduct, and that she was found 'guilty' of the same by her employer, UCSB." Balter denies that he has made any false and defamatory statements about Kurin. But this statement, along with the following one (No. 11), gets to the heart of the issues in this litigation. Firstly, Balter has never stated that Kurin herself was accused of sexual misconduct, although Kurin apparently interprets the title of one of his blog posts as implying this (see below.) Balter has never said that Kurin herself sexually abused students. Rather, Balter has reported that Kurin was fully aware of such conduct by Diogenes Enmanuel Gomez Choque, with whom she has had a long relationship starting before she was married to him, and which, according to Balter's reporting, has continued after the couple were supposedly separated. This reporting is based on a large number of witnesses and sources and represents Balter's honest conclusions based on that reporting. Balter does believe, based on his reporting, that Kurin did attempt to cover up Gomez's abuses, including those that took place during a field school that Kurin directed in Peru in 2015 and another field school she directed in Peru in 2018 (see below for more details.) Indeed, Kurin's employer, UCSB, came to a very similar conclusion in June 2016, when it concluded a Title IX investigation by finding that Kurin had retaliated against students who had reported sexual harassment by Gomez. Kurin attempts to deflect attention from this documented finding [Exh 1] by failing to tell the Court *anywhere* in her complaint about this Title IX proceeding. Instead, she has attempted to mask the truth of the matter by inflating Balter's use of the term "guilty" in this regard, insisting that she was never found "guilty" in any civil or criminal proceeding. Balter has no knowledge to the contrary; but his use of the word "guilty" was clearly in the colloquial rather than strictly legal sense. In fact, this is particularly obvious, because Balter *described precisely the circumstance under which Kurin had been found to have committed misconduct*, thus leaving no ambiguity in the minds of readers. The fact that Kurin and Balter disagree about the use of a particular word to describe misconduct which she has attempted to hide not only from her colleagues at UCSB

and the archaeology community, but also from this Court, does not constitute defamation and cannot be considered evidence of such.

11. Plaintiff Kurin states: "Balter has also published false statements that Kurin was married to an individual
convicted of raping college students, and that she repeatedly enabled her ex-husband to sexually abuse students." Defendant Balter has reported that while Kurin was married to Gomez, during her 2018 field school, Gomez sexually assaulted two female students, one so seriously that she is still traumatized to this day. This student, whom Balter has referred to as Student No. 3 to protect her identity, is now seeking justice for what happened to her. At the time of the assault, according to multiple witnesses who were present, Kurin tried to blame Student No. 3 for what happened, which adds to the evidence referred to above that Kurin attempted to cover up for Gomez. As for the raping of college students: Balter is currently researching serious allegations in Peru that Gomez, before he knew Kurin, was indeed convicted of rape. Gomez, of course, is not a party to this litigation, and Kurin cannot be held responsible for Gomez's actions before she knew him. Any implication that Balter holds her responsible is incorrect, although Balter does maintain, through his detailed reporting, that Kurin became aware at some point early in their relationship of Gomez's sexist and exploitative attitudes towards women and nevertheless not only maintained a relationship with him but actually married him. Finally, Kurin mentions another key issue in this litigation: Did she enable Gomez's abuses? Balter's reporting indicates that Gomez harassed or assaulted female students at nearly every field school Kurin has directed or codirected for nearly a decade, and that in many cases Kurin had knowledge of this behavior. In this sense, Balter stands by the use of the word "enabled," because Kurin failed in her responsibilities to exercise due care of vulnerable students in her charge. Even if Kurin disagrees with Balter's use of the word "enabled," Balter's use of it is a matter of his protected opinion and does not constitute defamation.

12. Defendant Balter maintains that all of his statements about Kurin are true to the best of his knowledge and belief, based on detailed reporting using documents and dozens of witness interviews.
Plaintiff Kurin states that Defendant Balter wishes to make Kurin "another victim of cancel culture" by preventing her from obtaining tenure at UCSB, and that he is doing this to enhance his own image. Although the term "cancel culture" is much in vogue at the moment, it is not relevant to this litigation, even if it suits Kurin's purpose of attempting to portray herself as a victim of vicious and unscrupulous forces. As stated above, Defendant Balter has made it clear that he believes Kurin's misconduct is so egregious, and that she is such a danger to students because of her refusal to protect them from a known sexual predator (Gomez), that she does not deserve tenure. Balter contends, on information and belief, that this is also the opinion of many members of Kurin's own anthropology department  at UCSB, based on their knowledge of alleged  abuses of students going back as early as at least 2014, when students first began to complain of such  alleged abuses (See, for example, http://michael-balter.blogspot.com/2020/08/university-of-california-santa-barbara.html and http://michael-balter.blogspot.com/2020/08/university-of-california-santa-barbara_13.html, where examples of  Kurin's alleged early abuses are reported.)

Balter's statements about Kurin's tenure process are protected opinion, which does not constitute defamation. Moreover, they also reflect the opinion of many colleagues who have known Kurin over the years, and that of most of the harassment and assault victims whom Balter has come to know through his reporting.

## JURISDICTION AND VENUE

13. Defendant Balter agrees that Plaintiff Kurin lives in Santa Barbara and Falls Church, VA, which is the home of her parents. Kurin's father, Richard Kurin, an official of the Smithsonian Institution, is a potential witness in this litigation.
14. Defendant Balter agrees that he is a resident of Westchester County and Croton-on-Hudson, NY.
15. Balter agrees that he and Kurin are residents of different states, but denies that he is responsible for any damages Kurin has suffered as a result of her own persistent misconduct.
16. Any damages Kurin has suffered in this matter are entirely due to her own conduct and thus amount to zero dollars. Defendant Balter, with all due respect to the Court, reserves his right to challenge whether the Court has jurisdiction in this matter.
17. Plaintiff Balter reserves his right to argue that the Court does not have jurisdiction in this matter, with all due respect to the Court.
18. While Plaintiff Kurin has indeed suffered grievous injuries to her reputation, they are not the fault of Defendant Balter, but of her own making. Indeed, Defendant Balter will present evidence at trial, based on his own investigations and on legal discovery, that Kurin's reputation had been badly damaged over a number of years before Balter had ever heard of her. This damage to her reputation occurred because of her negligence of students at her field schools, as described above and below; her abuse of students and even other faculty in the anthropology department at UC Santa Barbara, where she is employed; and even during her time as a graduate student at Vanderbilt University.
19. Defendant Balter denies that any of his statements about Kurin were or are false or defamatory. Balter stands by his reporting. Balter agrees that he tried, and succeeded, to get the widest possible attention and media coverage of his reporting, as is the desire of all journalists working on cases of misconduct. This is to ensure that the reporting makes a real difference in the world and that abuses and injustices are corrected by those with the power to do so.
20. Defendant Balter does not argue that this Court has jurisdiction over him as a person, although he reserves his right to challenge the Court's jurisdiction in this particular matter for the reasons stated above.
21. Please see No. 21.
22. Defendant Balter agrees with Kurin's descriptions of her professional titles.
23. Defendant Balter has no direct knowledge of Kurin's educational history, but sees no reason to disagree with her description of it.
24. Defendant Balter agrees that Kurin has led field schools in Peru, but has no direct knowledge of her relationship with the agencies she mentions.

25. Defendant Balter has no real argument with Kurin's description of her professional accomplishments, although he is aware of at least one critical review of the book she mentions and, based on his conversations with other experts in her field, believes that she is not as highly regarded as she seems to believe. Balter has had conversations with many faculty and students about Kurin, and he has concluded that her situation is really a tragedy. Kurin clearly does have substantial skills as a teacher and mentor, when she wants to, and exudes a certain charisma and charm. Those qualities have made the disappointment to many of her colleagues all the more painful when they have discovered the many cases in which she has committed misconduct and has blatantly lied about that misconduct, including lying to colleagues about the findings in the Title IX proceedings of 2016 (she told many that she had been "exonerated" by the process, which was flatly untrue.)

26. On information and belief, Defendant Balter agrees with Kurin's statements in this section.

27. On information and belief, Defendant Balter agrees that Kurin is scheduled to begin her tenure process in September 2020.


DEFENDANT

28. While Defendant Balter is currently a resident of Croton-on-Hudson, NY, some of the reporting for his posts on Kurin took place while he was a resident of Tarrytown, NY.

29. Plaintiff Kurin states that Balter is a "self-described archaeology buff." This is an inaccurate and misleading statement, designed to portray Balter to the Court as some sort of amateur. Balter began writing about archaeology for *Science* in the mid 1990s, around the time that Kurin would have been a young teenager. The first archaeology story he can recall writing was in 1996, and concerned a structure built by Neanderthals in a cave in France (see https://science.sciencemag.org/content/271/5248/449.1) Since then Balter has reported and written hundreds of archaeology stories for *Science, Discover, Smithsonian*, and other publications. Balter agrees in part that he is a "former" adjunct instructor of journalism, although he does not agree with Kurin's implication that his career as a journalism teacher is somehow over.

30. Balter agrees that he publishes a blog entitled "Balter's Blog," which began in 2008 as a venue for commenting on the election that gave us President Barack Obama.

31. Plaintiff Kurin vastly understates the body of work Balter has produced over 42 years as a journalist, as noted above.

32. Balter did not publish a "purported archaeology book" in 2005. Balter published a real archaeology book, entitled "The Goddess and the Bull." The publisher was the Free Press, an imprint of the book publishing giant Simon and Schuster, and he received a $100,000 advance for it. The book was about the 9500 year old Neolithic village of Catalhoyuk in Turkey, which is not considered a city since urban conglomerations did not appear until at least 5000 years later.

33. Beginning in this section, Plaintiff Kurin engages in a frankly silly, but blatantly false, attempt to discredit Balter as a serious archaeology writer by cherry-picking a few negative reviews on Amazon. If Kurin sought professional rather than amateur

evaluations of the book, she only had to look at the back jacket cover for testimonials from some of the leading archaeologists and anthropologists in the world, including well known archaeologist and archaeology writer Brian Fagan, an emeritus professor from her own anthropology department at UCSB.

**Brian Fagan**, Emeritus Professor of Anthropology, University of California, Santa Barbara
Michael Balter takes us on a fascinating journey through the excavations at one of the world's great archaeological sites. He provides an engrossing chronicle of one of the world's earliest farming villages and of the personalities and thoughts of the archaeologists engaged in the research -- the human side of archaeology.
[Brian Fagan, from Kurin's own institution, is one of the most pre-eminent archaeology writers in the US. Full disclosure, I once profiled him for *Science*.]

**Bruce Trigger**, James McGill Professor, Department of Anthropology, McGill University, Montreal
A superb biography of a super archaeological site! Balter also demonstrates how this work is radically transforming what all archaeologists think and do. His carefully researched and compellingly written narrative, which makes readers feel as if they are there, will be read with pleasure and interest by professional archaeologists and all who are interested in archaeology. Balter's skillful weaving together of archaeological findings, the personalities and ambitions of a broad cast of archaeologists, and the evolution of archaeological thought makes this book a classic.
[The late Bruce Trigger was one of the most important historians and philosophers of archaeology.]

**Ian Tattersall**, Curator, Division of Anthropology, American Museum of Natural History
Çatalhöyük is not only an archaeological site of tremendous importance, it is one with a dramatic history -- both ancient and modern -- that Balter tells with verve and an abundance of personal detail. His book is foremost about a site that offers unique insights into the origins of our own civilization; but at the same time it is an evocative portrayal of the process of archaeology itself.
[Ian Tattersall, one of the most foremost paleoanthropologists in the US, is now retired from the AMNH. Unfortunately, his replacement, Brian Richmond, turned out to be a sexual predator, the first one I reported on. He was later forced to resign from the museum.]

**Colin Renfrew**, Professor Emeritus, University of Cambridge
An engagingly personal account of one of the most ambitious excavation projects currently in progress, undertaken at one of the world's great archaeological sites; a revealing narrative of people and ideas at the working face of archaeology.
[Colin Renfrew is the most famous archaeologist in the United Kingdom, and known throughout the world for his studies of civilization and language]

**Heather Pringle**, author of *The Mummy Congress*
Erudite and meticulously researched, *The Goddess and the Bull* takes us behind the scenes of archaeology on the world stage, revealing the pitched political battles, the sometimes battered egos, and the stubborn quest for knowledge at one of the world's most important archaeological sites, Çatalhöyük.
[Heather Pringle is one of the US's most prolific archaeology writers, author of many books on the subject. Full disclosure, she is also a good friend of mine]

Last but not least, I believe that *The Goddess and the Bull* is the only archaeology book endorsed by a rock star. Here, from the back cover of the paperback edition:

**David Bowie*, Rock Musician***
"I liked it very much. A little heavy on theory for my taste but exciting to read of what could have been the first town. I also approve of burying the dead under the floor. At least you'll remember where you put them."

I tell the story of how Bowie came to read and comment on the book in this piece published after he died. The publisher of the paperback edition of the book, Mitch Allen of Left Coast Press (since purchased by Routledge) was not only highly amused but very pleased to read these comments by Bowie, because the fact that it was heavy on theory made it ideal for his marketing plan to sell it as an academic book to be used in university classes.)

Defendant Balter includes these comments from experts much more senior than Kurin not to try to convince the Court to buy his book, but to illustrate the bogus and easily disproved nature of her attempts to discredit an experienced archaeology writer and deflect attention from her own misdeeds, which have greatly harmed a significant number of students and endangered her tenure efforts at UCSB.

As for the specific point she tries to make in this section, it is false that in this book Balter focused on who the archaeologists "hooked up" with. The book was advertised as a "biography" of an archaeological site and thus the lives of the archaeologists themselves were a major part of the narrative. In telling their stories, it was natural to write about their important relationships which were often with other archaeologists. Kurin's purpose here, to portray Balter as somehow unnaturally interested in the sex lives of others and thus motivated to make false statements about the subjects of his reporting, including Kurin, are totally false.
As further evidence for Balter's rejections of Kurin's statements that Balter is obsessed with sex, Balter offers this Amazon review from noted Africanist archaeologist Scott MacEachern, formerly of Bowdoin College and now Vice-Chancellor for Academic Affairs at Duke Kunshan University:

"Balter's account of the social aspect of excavation on the site is great. Archaeological projects are usually intensely social situations -- sometimes too much so -- unlike the more solitary work of cultural anthropologists. The goings-on in field camps often enter the folklore of the discipline, and again are part of the biography of the site. Digs _are_ 'Archaeology Camp' (sometimes in both senses of the latter word) and it's refreshing to see a realistic portrayal of how fieldwork happens on one of the biggest, most complex archaeological projects in the world. This book is really excellent. I've been recommending it to acquaintances, not just as a book about Catal Höyük (although it's great coverage of that site) but as a book about how archaeology gets done." (Citation: https://www.amazon.com/gp/customer-reviews/R18ULDCE9ZPR3E?ref=pf_vv_at_pdctrvw_srp)

34. Plaintiff Kurin quotes an Amazon reviewer who criticizes Balter's discussion, in his book, of the interpretation of an arrowhead which the late archaeologist Marija Gimbutas thought represented a human pubis. Balter assumes that Kurin has enough archaeological training to know that Gimbutas' contention that a Mother Goddess was worshipped at Catalhoyuk is controversial and was questioned by the last team that worked there, which is the subject of Balter's book. Again, Kurin is attempting to mislead the Court into drawing certain conclusions about Balter's focuses in his journalism that are completely untrue.

35. Balter defers here to the remarks made in the previous section about his book, so as not to waste the Court's time any further with Kurin's frivolous attempts to mischaracterize the Defendant and his motivations.

36. This section about Balter's book demonstrates the dishonesty with which Plaintiff Kurin has described his motivations and attitudes. The passage she quotes clearly states that the "voyeuristic" tendencies referred to, somewhat jokingly, were those of the archaeologists reading each others' diaries and not those of Balter himself. Kurin's attempts to use a highly rated archaeology book, still in print after 15 years, which has been widely used in archaeology classes (including in Turkey, where it is also used in archaeology classes to this day and sold in bookstores in Istanbul), against the Defendant are illustrative of the fully dishonest case she attempts to put before this Court.

37. Kurin makes the following statement:  In 2016, Science Magazine terminated Balter's 25-year career with the

publication for misconduct and a "breakdown of trust" after he accused a professor of exaggerated charges of sexual harassment and hounded the accused, his friends, family, and colleagues." In this and following sections of the Complaint, Plaintiff Kurin makes a startling series of admissions of her total bias towards and sympathy with abusers who have been found "guilty" of misconduct by their own institutions and subjected to severe discipline. To deal first with Balter's relationship with *Science*: It is true that in 2016 *Science* terminated Balter's contract after 25 years, during which he produced nearly 900 articles on a wide variety of subjects, all of which are still on the journal's Web site. However, Kurin is flatly wrong when she says it was for misconduct. Not only is that not true but Kurin provides no evidence

for it, because there is none. Kurin also dishonestly quotes the phrase "breakdown of trust" when those words, offered as a commentary to a publication covering the termination by *Science's* news editor Tim Appenzeller, are an incomplete quote. The actual quote from Appenzeller, who otherwise made little public comment on the dispute, can be found in this article in the science publication *Undark*: https://undark.org/2016/03/17/writers-editors-science-popular-science/.

The full passage that Kurin selectively and dishonestly quotes from is as follows:

"Appenzeller told me in an email on March 14th that "Michael's termination says nothing about Science's commitment to covering sexual harassment," and "his parting with Science has nothing to do with the published story." The preparation of the story "brought to a head a long-standing, mutual loss of trust," Appenzeller wrote.

Balter has a history of public disagreements with Science. In 2014, he protested the firing of four female colleagues by taking a three-month leave of absence. And in mid-January, he wrote a series of tweets critical of the handling of the Richmond story…"

Defendant Balter notes that there was no mention of "misconduct," an allegation that Kurin has made up out of whole cloth. Rather, there was a mutual loss of trust, and this brief description of the reasons for it is sufficient to contradict Kurin's false implications. It also provides background for Kurin's craven identification with sexual abusers. The story referred to is that of Brian Richmond, former curator of human origins at the American Museum of Natural History in New York City. *Science* assigned Balter, who was teaching at NYU at the time, to investigate allegations of sexual assault and harassment against Richmond. Balter's reporting, even before it was published, induced the museum to begin its own investigation, which ultimately led to Richmond's resignation in December of 2016. The charges were not "exaggerated," as Kurin states, and Balter did not "hound" Richmond, nor his family and colleagues. In fact, Richmond was quoted in multiple places, and at length, in Balter's article in an attempt to defend himself and in Balter's and *Science's* attempts to be fair to him. As for his colleagues, the anthropology community rallied around the attempts to get at the truth of Richmond's misconduct, as described in the *Science* article that Balter wrote and reported and whose integrity editor Appenzeller defends above: https://www.sciencemag.org/news/2016/02/sexual-misconduct-case-has-rocked-anthropology. (Balter consulted with more than 60 sources in the anthropology community for this article, all of whom willingly provided input and details for the story.) This bogus account by Kurin provides a very clear example of the way she has completely stretched the truth into an unrecognizable shape to fulfill her goal of scapegoating the reporter who has exposed her misconduct.

38. Please see the response to No. 38 above which covers the bogus claims Kurin makes in this section.

39. Balter denies that he is motivated by voyeurism. It is true that Balter has investigated dozens of cases of actual misconduct in academia, including sexual harassment, bullying, and retaliation, using the journalistic techniques described above. As also stated above, these fact-based investigations have often led to the termination or resignation of the abusers. While Kurin should know, based on the publications of scholars in her own field and that of anthropology, that sexual misconduct is a very serious problem, especially at field schools like the ones she has run in Peru, Kurin tries to pretend that these are all fantasies of Balter's fevered imagination. The facts show otherwise.

40. Balter agrees that he maintains, on his blog, a "Rogue's Gallery" of abusers. These are limited to the cases that he has actually worked on, and Balter stands by the reporting in each and every case, including Kurin's. A look at the links provided in the individual stories shows the long and serious research they represent.

41. Kurin makes the following statement:  "In April of 2019, Balter was forcibly detained by security and then ejected from a Society for American Archeology annual conference after he tried to physically assault an

alleged sexual harasser at a conference – and refused to calm down or disengage and behave

himself in a civil manner." *Everything in this statement is false*, and if Kurin had simply read the article in *The Scientist* she links to she would know that—making her statement recklessly false. First, let's identify the "alleged sexual harasser." He is David Yesner, a former archaeologist at the University of Alaska, Anchorage, who was found in a Title IX proceeding to have sexually assaulted and harassed numerous students over a period of decades (see https://www.ktva.com/story/40180592/title-ix-investigation-reveals-decades-of-sexual-misconduct-by-former-uaa-professor.) As a result of these findings, Yesner was denied emeritus status at the university when he retired; Yesner was banned from stepping foot on any University of Alaska campus; and Yesner was banned from participating in any activity anywhere in the world where University of Alaska students were participating (see https://www.ktva.com/story/40272991/uaa-police-former-professor-accused-of-sexual-misconduct-banned-from-university-property-events.) *In citing this case, Kurin continues to demonstrate her apparent sympathy for sexual predators, whose side she takes in multiple instances in signing her name to this Complaint.* Next, let's address the falsehoods concerning  Defendant Balter. In fact, Balter was not detained by security (no security personnel were involved in this episode at any time;) Balter did not try to physically assault Yesner but rather escorted him out of the meeting using the power of embarrassment (Yesner agreed to leave, although he came back later.) The reason Balter did this is that some of his victims were in attendance at the meeting, and they asked Balter for help in dealing with the situation because Yesner was attending sessions of the meeting they wished to attend and they were afraid to be near him. When officials of the Society for American Archaeology were notified of the situation, they allowed Yesner back into the meeting and banned Balter from the meeting (this was the following day.) The mishandling of this situation by SAA led to an uproar among archaeologists, who condemned the failure of SAA officials to protect Yesner's victims and for banning Balter from the meeting. The whole

episode led to months of campaigning by archaeologists to get the SAA to improve its policies, and also led many SAA members to resign their memberships. (*Shortly after the April events, SAA did indeed ban Yesner from the organization and all of its meetings and events.*) A good summary of events can be found in this article by Lizzie Wade, a correspondent for *Science* who took over much of Balter's archaeology coverage when his contract at the journal was terminated: https://www.sciencemag.org/news/2019/04/metoo-controversy-erupts-archaeology-meeting

The use (or rather misuse) of this episode by Kurin reflects not only *her disdain for the victims of sexual misconduct*, which we have seen in her own personal conduct regarding the misdeeds of her former husband Gomez, but also her disdain for basic facts demonstrated in nearly every section of her Complaint. It also goes to the question of *whether Defendant Balter was on firm ground when he reported his conclusion that Kurin had enabled sexual abuse, and provides strong supporting evidence for that inference.*

42. Plaintiff Kurin makes the following statement: "In April of 2020, Balter accused Ran Boytner, the executive director of the Institute for Field Research ("IFR") of a massive cover up related to systemic misconduct,

something Boytner adamantly denied in a persuasive and credible statement, also published by

Balter but decried by him as 'lies.'"  Defendant Balter will be able to prove at trial that not only Boytner but other leaders of IFR covered up their earlier knowledge of 2016 Kurin's Title IX proceeding at UCSB and other matters related to Kurin's involvement with IFR. Balter stands by the factual and documented basis for his reporting on these matters. To make things worse, Balter's reporting has produced strong evidence that Boytner himself engaged in sexual misconduct (allegedly sexually assaulting a student at his own field school in Peru,) and sexual harassment, bullying, and retaliation against IFR staff. The IFR board of governors terminated Boytner's position as executive director after these matters came to light.

43. In this section Kurin refers to Balter's reporting on the former Vice-Chancellor and President of the University of Adelaide, Peter Rathjen. This is yet another attempt to mislead the Court into thinking that Balter makes wild, unsubstantiated claims about individuals without evidence. Balter stands by his reporting about Rathjen, and asks the Court to note that Rathjen was put on leave earlier this year while being investigated by an Australian government body for an inappropriate sexual relationship with a colleague and other alleged misconduct, and finally resigned for "health reasons." See https://www.afr.com/work-and-careers/education/adelaide-university-vc-peter-rathjen-resigns-20200720-p55dpb

44. Plaintiff Kurin states that Balter was "terminated" from his job teaching journalism at City College of New York, where he taught during the 2019-2020 academic year and received the highest student evaluations of his entire teaching career. This statement is false. Balter was not terminated, but, along with 2800 adjunct faculty in the City University of New York system of which CCNY is a part, was not reappointed to teach this fall. Kurin cites Balter's own blog post about his sadness that he would no longer have contact with the diverse student body at CCNY as her only evidence.

Kurin also states that there is some irony here in that Balter thought methods and ethics of journalism. Of course, the fact that the coronavirus pandemic has led to massive layoffs at CUNY and other educational institutions has received wide media coverage, and yet Kurin somehow thinks the Court will regard Balter's personal situation as evidence of some kind of misconduct. To that end, Kurin's attorney has filed New York Freedom of Information Law requests with CUNY and CCNY in a vain attempt to find evidence of misconduct by Balter, including—and here is some real irony—any Title IX complaints against him. (There are none.) Kurin's reckless and desperate attempts to throw any dirt she can at Balter in order to cover up her own documented misconduct must fail.

45. Please see No. 45 above for Defendant Balter's response to these innuendos and falsehoods.


## FACTUAL BACKGROUND

46. Defendant Balter agrees that Kurin ran a field school in Peru in 2015 with Gomez. Balter notes that a three-year marriage is not "brief," but also that Kurin and Gomez had been engaged in long-term relationship going back as early as 2009. Based on information and belief, it is common in Peru for couples to tell friends and family they are "married" in situations where they are living together, as Kurin and Gomez did for many years  when she was in Peru. Balter contends that Kurin's relationship with Gomez, including her sexual relationship, continued at least into December 2019, the month of their final divorce decree.

47. Kurin refers to an "alleged incident" that took place during her 2015 field school in Peru. In actual fact, as found by UCSB's Title IX investigation in June 2016, there were several such incidences of sexual harassment by Gomez and some of the direct victims of these actions gave evidence in the proceedings. UCSB concluded its investigation by not only finding that Gomez had indeed sexually harassed students, but that Kurin actively retaliated against several victims and witnesses. That finding led to Kurin's three year administrative leave. (See Exh 1.) Part of Kurin's retaliation consisted of posting Facebook attacks on the victims in this case, calling them "racist gringas." She also attempted to contact the adviser of at least one student. Although Kurin has since deleted these Facebook posts, screenshots are available.

48. Kurin cooperated with the Title IX investigation for only a limited period of time. Once the Title IX office made the allegations clear to her, she withdrew her cooperation, as stated in the Title IX findings themselves (Exh 1). Gomez provided more cooperation than Kurin, but the allegations against him were nevertheless upheld.

49. Plaintiff Kurin makes the following statement: "UCSB never charged Kurin with sexual harassment or enabling a sexual harasser, and Gomez was never charged with any crime in either the United States or Peru." This statement is clearly designed to mislead the Court. As Defendant Balter pointed out above, *one of the*

*most egregious abuses of the judicial process committed by Kurin* is her failure to tell the Court that she and Gomez were subject to Title IX proceedings at UCSB and to tell the Court the results of those proceedings. Kurin thus seeks to deny the Court information and context that are absolutely crucial to judging the validity of her claims against Balter. This can only be seen as desperation on her part, because she must have known that Balter would bring this history to the attention of the Court. As for whether UCSB charged Kurin with sexual harassment or "enabling" a sexual harasser, Kurin again attempts to muddy the waters. Balter has never stated that Kurin herself had sexually harassed anyone. But Balter's statements that she "enabled" a sexual harasser are clearly born out  by the evidence, evaluated in the Title IX investigation, that she had retaliated against students who reported  Gomez. In that sense, she not only attempted to cover up Gomez's misconduct, but made it possible for her and Gomez to continue hosting students at their field schools in Peru. This led directly to the sexual assaults in 2018, which, Balter contends as his protected opinion, would not have happened had Kurin dissociated herself from Gomez after 2016. Instead, she married him.

50. Please see the discussions above about whether the use of the word "guilty" to describe Kurin's misconduct is appropriate. Even if the Court finds that it is not, or that Balter's use of the word is not sound, this honest opinion is protected does not constitute defamation.

51. Kurin makes the following statement: "During the course of its investigation, UCSB became aware of communications Kurin had with participants who had been on the trip to Peru. UCSB then investigated Kurin's interactions with the individuals." Again, Kurin attempts to mislead this Court by masking the true facts of the events she describes. As noted above, the "communications" she mentions were found by an official UCSB investigating body to have consisted of retaliation against the participants at her field school.

52. Kurin says that she "amicably" settled the issues raised by the Title IX in 2018. Balter does not have information to confirm or deny this statement, but expects to be able to elucidate the matter through discovery in this case. Balter does contend that the Title IX findings were not somehow erased but still stand as the university's findings. Balter also contends that UCSB put Kurin on a three year administrative leave, a serious disciplinary measure that demonstrates the severity of her misconduct. Were these events to take place today, in the so-called "#MeToo Era," Balter contends that it is more likely her employment would have been terminated. Finally, Kurin makes the following statement: "Neither UCSB nor any other entity found Kurin guilty or liable for any misconduct." Plaintiff Balter has provided ample evidence above that this statement is not only misleading but factually wrong.

53. Kurin makes the following statement: "In 2016, Kurin and Gomez married." Balter agrees that the couple were married in February 2016 in Santa Barbara. However, Balter is actively investigating whether Kurin and Gomez were married earlier in Peru, and reserves the right to amend this Answer once that investigation is completed.

54. In this section, Plaintiff Kurin refers to an "incident" that "allegedly occurred" at her 2018 field school in Peru, involving Gomez and some other Peruvians. It is telling that Kurin fails to say what the incident consisted of. In reality, Gomez sexually assaulted at least two students during the field school season, including one—at the very end of the season—who is still traumatized today by her experiences. Kurin's statement that she "immediately reported" the incident to "appropriate authorities" is false and misleading. As Balter has reported, at a meeting of some of the field school students and teaching assistants the next day after the "incident," Kurin attempted to placate the students and actually blamed the assaulted student— whom Balter called Student No. 3 in his reporting, to protect her identity—for what had happened to her. A recording of this meeting, which the students made with Kurin's knowledge, is in Balter's possession and reveals a very different picture than that falsely given by Kurin to this Court. It is true that Kurin reported the incident to officials of the Institute for Field Research, which had sponsored the field school, but ONLY after the students made it clear that they were going to make their own report to IFR. Balter does not know the extent to which Kurin eventually cooperated with the inquiry by IFR, but intends to explore that question via legal discovery.

55. It is true that UCSB was not involved in the 2018 incident at the time, although more recently a number of individuals, including Student No. 3, have filed Title IX complaints against Kurin. Balter will update the Court on those filings below. Although Balter does not have direct confirmation, he believes that Gomez was found to have engaged in "inappropriate behavior," if sexual assault can be fairly described that way. On information and belief, IFR did find that Kurin had herself behaved inappropriately, on at least two counts: She allowed the drunken Gomez to enter the house where Student No. 3 was sheltering after the assault, and she failed to provide a safe environment for the students. Finally, IFR did not end its relationship with Kurin's field program, it ended its relationship with Kurin herself. Kurin's statement that this was "without prejudice" is absolutely false. As IFR executive director Ran Boytner put it in a note to the field school students on October 17, 2019, after the investigation was completed:

"We have completed our investigation into complaints of alleged inappropriate behavior during the night of July 13-14 at the Peru-Wari field school. Our investigation was conducted promptly, thoroughly and confidentially, as is our practice.  In our investigation we did substantiate that inappropriate behavior occurred. Such conduct violates IFR policy and standards of conduct. The IFR will no longer work with Dr. Danielle Kurin, the director of the field school.
At this point, we consider the investigation closed.
      Sincerely,
      Ran Boytner
      Executive Director"

During a recent "Town Hall" at UCLA held to discuss matters concerning how IFR had handled incidents of sexual abuse, and the reasons why Boytner was no longer executive director, IFR board members confirmed the statement above that IFR would no longer work with Kurin. For

example, IFR academic board member Jason de Leon of UCLA's Cotsen Institute of Archaeology made the following statement at the meeting:

"When the field school ran again in 2018, and then for the first time IFR received notice of what had been going on, we conducted a very thorough investigation and found that, you know, that bad things had happened and that she should not be near students at all, and we immediately cut ties with her."

At that same meeting, Willeke Wendrich, director of the Cotsen Institute and chair of the IFR governing board, made the following statement:

"After IFR found out of the problem in the field school in 2018, we severed all ties with Danielle Kurin."

(For the partial transcript of this meeting, see:  http://michael-balter.blogspot.com/2020/06/a-ucla-town-hall-on-meto-and-related.html)

56. Plaintiff Kurin makes the following statement: "Soon after the IFR completed its investigation, Kurin and Gomez separated and Kurin filed for divorce." In Kurin's divorce records, which Balter has obtained from the California Superior Court for Santa Barbara, Kurin states that she and Gomez were separated in August 2018, that is, very shortly after the July 2018 incidents at her field school referred to above. On information and belief, this was not a real separation, because during 2019, according to several direct witnesses Balter has interviewed, Gomez and Kurin continued to live together as a couple when she was in Peru. Nevertheless, it is not true that Kurin filed for divorce from Gomez "soon" after IFR completed its investigation, by any stretch of the meaning of that word. As stated above, the IFR investigation was completed in October 2018; Kurin filed for divorce in May 2019. A more likely explanation is that Kurin, realizing that she was returning to teaching at UCSB in fall 2019 and would be up for tenure a year later, sought to create the impression among her colleagues that she had severed her ties with Gomez. Indeed, some colleagues have spoken to Balter about a "sham divorce."

57. Plaintiff Kurin makes the following statement: "Kurin has not communicated substantively with Gomez, save for effecting the divorce proceedings and closing down research projects, for close to two years as of the date of filing of this action." On information and belief, Balter contends that this statement, made under penalty of perjury, is not true. Balter has communicated with three witnesses who observed the couple in Peru during 2019. One of those witnesses, someone who has passing through Andahuaylas, where Gomez is based, observed that they were "acting like a couple." Two of the witnesses observed Kurin in Gomez's bedroom (and bed) and assert that they were sleeping together in the same bed. While it is often the case that a separated or divorced couple might sleep together in recognition of feelings that they still had, or once had, towards each other, these facts suggest that Kurin has tried to mislead the Court about the matter.

58. Plaintiff Kurin makes the following statement: "In September 2019, Kurin returned to UCSB as a full-time assistant professor and has been highly successful." Defendant Balter agrees that Kurin returned to UCSB and teaching at that time. As for whether she has been highly successful, this depends on the meaning of that term. Balter has never denied that Kurin can be a talented teacher, and he has no knowledge on which to judge her academic scholarship. But Balter does believe, based on his reporting, that faculty in her department are now keenly aware of her history of misconduct, as revealed by Balter's accurate and honest reporting, and that that awareness has created a cloud over Kurin's tenure bid. This is due to Kurin's own actions, and her attempts to hide them, and not to anything that Balter has done. For example, Balter has talked to individuals who were told by Kurin that she was "exonerated" in the Title IX process, which is flatly untrue; Ran Boytner has made similar statements to a broader number of archaeologists. It is inevitable that Kurin's fellow faculty members will take note of the discrepancies between the actual record of the 2016 Title IX process and Kurin's false descriptions of it to others.

59. Defendant Balter makes no argument with these assertions about Kurin's teaching skills and academic life.

60. Balter agrees that Kurin's tenure process will begin in September 2020.

61. Plaintiff Kurin makes the following statement: "Nevertheless, Balter's lies and misrepresentations have caused Kurin severe harm." In this and the following two sections, Kurin asserts that everything would have gone fine for her were it not for Balter's reporting, and that only Balter is responsible for the troubles she is now experiencing with her tenure bid and with her reputation in the scientific community. Nothing could be further from the truth. Balter's accurate and honest reporting finds that Kurin has been a subject of conversation in the archaeological community for many years, long before Balter had first heard of her last fall. Indeed, Balter began his reporting on Kurin because he was approached by an archaeologist who knew of her misconduct going back many years, and was in touch with victims of Gomez and Kurin's negligence at her field schools. This initial source, along with many other former field school students, students at UCSB, and other individuals who had known and followed Kurin's career, *were very concerned that UCSB was allowing Kurin to return to teaching and to contact with students, because they clearly stated that Kurin was a "danger to students."* (This last phrase has been used numerous times in my conversations with these concerned colleagues.) Thus, Defendant Balter, as a reporter, has served mainly as a messenger for these concerns and the very well established and documented facts that support them.

62. See No. 62 above. Plaintiff Kurin really has it backwards. Balter has reported the concerns of others, and reported on their testimonies about abuses committed by her former husband Gomez as well as Kurin's own negligence and enabling of those abuses over many years. He did not originate these assertions, nor, clearly, did he make them up to harm Kurin. Balter has no malice towards Kurin, even if he has expressed his protected opinion that she should not receive tenure at UCSB. Balter is far from alone in this belief.

63. See responses to No. 62 and 63 above. Again, Balter totally denies that he is the source of Kurin's problems.

## DEFAMATON *PER SE*

64. Plaintiff Kurin makes the following statement: "Upon Kurin's return to UCSB in 2019, Balter discovered that Kurin had been on leave during and after the UCSB investigation." This statement seems to imply that Balter somehow went in search of this information for reasons that are not explained. As explained above, Balter was approached by first one and then a number of archaeologists concerned about Kurin's return to work since they regarded her as a danger to students based on the harassment and assaults at her field schools, and also her abuse of students at UCSB itself. As a #MeToo reporter, Balter felt obliged to investigate these allegations, as he has done in many other cases.

65. Kurin states: "Balter submitted a request under the California Public Records Act to UCSB." This is true. Balter's sources indicated that Kurin and Gomez had been subject to Title IX proceedings. Using standard reporting techniques, Balter successfully obtained from UCSB, after several months, the investigative and findings files pertaining to those cases.

66. Kurin states: "Balter also called and emailed numerous professors, students, and administrators
    harassing them endlessly and making spurious allegations against Kurin." It is true that Balter, using standard investigative reporting techniques, contacted a number of additional sources in the course of his reporting. It is flatly untrue that he harassed any of them. In fact, a number of these sources began talking to Balter on a regular basis and in turn suggested other sources he might talk to. Balter's reporting and writing about Kurin are based on the same journalistic methods used by any other reporter. Unfortunately, in this case, that reporting led to a long series of revelations about Kurin's conduct and misconduct.

67. Kurin states: "A few individuals did speak to Balter, and their hearsay-gossip-opinion-laden remarks are included in his blogs, but they provide few actual facts." This statement is false on multiple counts. Many more than a "few" individuals spoke to Balter, and in nearly every case they were people who had directly witnessed the events Balter later wrote about in his reports about Kurin. Like all reputable reporters, Balter's reporting does not rely on hearsay, gossip, or mere opinion. All of the factual statements in Balter's reports are based on multiple, direct witnesses, including victims of sexual harassment and assault. Balter does not rely on hearsay, rumors, or second hand accounts in his reporting, even if rumors can sometimes lead a reporter to sources who do have first hand knowledge. That is standard journalism.

68. Balter agrees that he published the blog post referenced here.

69. Plaintiff Kurin attempts to mislead the Court with a number of quotes taken out of context. As indicated above, Balter has never said that Kurin herself sexually abused

anyone, only that she enabled such behavior by Gomez and thus in that sense participated in it over many years. Balter often referred to Gomez as Kurin's "partner" because at times during the events that are subject to this litigation they were married and at times they were not. Balter's characterization of Kurin and Gomez as a "couple" is correct and, on information and belief, is still correct. As discussed at length above, Kurin was found by UCSB to have retaliated against students, full stop. The use of the term "guilty" is in dispute between the parties but is not evidence of defamation. Kurin's retaliation against students who reported Gomez's abuses, in Balter's opinion, constitute an attempt to cover up his misconduct. Even if Kurin disagrees with Balter's choice of words, they are in essence true and cannot constitute defamation. According to the Title IX findings, Kurin stopped cooperating with the investigation at UCSB right after the allegations were made clear to her (Exh 1.) There is no mention in that document that investigators no longer wanted to hear her evidence, and Balter believes that this statement is unlikely to be true. Balter stands by his statements that the archaeology community is "frowning" upon Kurin, based on his extensive conversations with archaeologists across the US and internationally. Balter's statements about UCSB's attempts to deprive Kurin's fellow faculty of information about the 2016 Title IX are true and well supported by witness statements. The anthropology faculty were kept in the dark about the reasons for Kurin's three year administrative leave; only a few faculty were told the reasons and they were told not to divulge them. Kurin herself told a number of colleagues, falsely, that she had been "exonerated" by the Title IX process. It is true that the chair of IFR's governing board, archaeologist Willeke Wendrich of UCLA, told Balter in an email that he was publishing falsehoods when he wrote that IFR knew about the Title IX long before it admitted that it had. Balter will prove at trial that Wendrich lied not only to Balter but also to her colleagues at UCLA, and that she and other board members found out about the Title IX no late than October 2016. In that sense, IFR did indeed participate in a coverup, and has continued to do so, possibly to avoid legal liability for the sexual assaults that then took place during the 2018 field school, when IFR was responsible.

70. Defendant Balter agrees that he has used available social media platforms, including Facebook and Twitter, to publicize his reporting, just as almost all reporters do including at the *Washington Post* and the *New York Times* (just as an example, NY Times reporter Maggie Haberman Tweets dozens or hundreds of time each day, promoting both her own articles for the Times and those of other colleagues.) Before Balter was a #MeToo reporter, he also Tweeted all of his stories about megalithic monuments, the newly found fossils of human ancestors, and the latest species of dinosaurs. As a #MeToo reporter, Balter has found that continual dissemination of his stories has led to real action against sexual abusers and justice for their victims.

71. Same answer as No. 71.

72. Same answer as No. 71.

73. Defendant Balter has already responded to these assertions above. Balter stands by his reporting and statements in each and every case mentioned in this section. Except for the previously mentioned dispute over the meaning of the word "guilty," over which honest people can disagree and which does not constitute defamation, Balter again asserts his opinion that Plaintiff Kurin has sought to mislead the Court about the findings of the various investigations concerning her. She was in fact found to have retaliated against students in UCSB's investigation, and Balter's own findings that she created and maintained the conditions under which Gomez was able to repeatedly harass and assault students justify the contention that she enabled him.

74. Balter agrees that he published the blog mentioned by Kurin.

75. Balter agrees that he posted the blog on Facebook, for the reasons described above.

76. Balter agrees that he published this link.

77. Balter agrees that he published the blog cited, but denies that any of his statements were defamatory.

78. Balter stands by his statements about the IFR and its attempts to cover up its knowledge of Kurin's prior misconduct, and will prove those statements at trial.

79. Balter agrees that an anonymous poster wrote those words on his blog. Since these blog posts were published, literally hundreds of individuals, many members of the archaeology community, have commented on the ongoing reporting, as is their right.

80. Balter agrees that he published these comments but denies that they were defamatory. Balter again notes that Kurin's disagreements with the use of the word "guilty" are designed to mask the greater truth that she was found by UCSB to have retaliated against students, *a finding that she has dishonestly and misleadingly sought to hide from this Court throughout her Complaint.* Balter admits to being perplexed as to why Kurin thought that he, as the Defendant in this lawsuit, would not bring the Title IX findings to the Court's attention. Balter speculates that Kurin may have thought that Balter would quickly settle this matter and delete all his blog posts for fear that Kurin would win the litigation and ruin him financially, which is her clear intention. Balter actually has no such fears, due to his belief that the Court will find him innocent of defamation based on the clear evidence; and even if he did harbor such fears, his duties as a reporter would require him to continue reporting and writing about both Kurin and the progress of this litigation.

81. It is true that Balter moderates his blog, but he rarely censors any comments and only does so when he considers there is a compelling reason. Since this is literally "Balter's Blog," Balter is free under the First Amendment to monitor and control its content.

82. Kurin refers to a "Rogue's Gallery" that Balter maintains on his blog of investigations he has conducted. The gallery includes a number of categories of abusers, including bullies. Balter's interviews with witnesses confirms that Kurin is widely considered a bully among her colleagues. For example, she has not infrequently invoked the name of her father, Richard Kurin, a senior official at the Smithsonian Institution, and threatened colleagues that she would get him to ruin their careers if they crossed

her. This behavior goes back at least to the time that she was a graduate student at Vanderbilt University, according to witnesses who have know her that long. As previously stated, Balter stands by his statements that Kurin has enabled Gomez.

83. Balter denies that his statements are defamatory, and stands by the intensive reporting that have led to them.

84. Balter denies that anything he has said about Kurin is defamatory. As for whether it is "injurious," Balter concedes that if negative information is revealed about an individual, that could be harmful to them; but as the reporter, Balter bears no responsibility for the consequences the truth has on Kurin. Kurin's speculations as to Balter's motives are wrong and she has no factual basis on which to make such statements, other than her own desire to deflect the Court's attention from her own misconduct.

85. Balter denies the asssertions by Kurin in this section, as stated above.

86. Balter agrees that he has discussed his reporting about Kurin's misconduct on social media, but denies that anything he has said is defamatory, as discussed above. Balter agrees that he has expressed his protected opinion that Kurin does not deserve tenure at UCSB. While Kurin interprets this as malice towards her, Balter is actually motivated by the concerns expressed by many other archaeologists that Kurin is a proven danger to students and should not be allowed to have contact with them.

87. Kurin again brings in the fashionable phrase "cancel culture" to describe Balter's motivations for reporting truthfully about her. Remarkably, even at this point in her Complaint, Kurin has offered no theory as to why Balter would have malice against her, especially as he has never met her in person. The reason for that is simple: Other than his disapproval of Kurin's misconduct, Balter has no other reason to be antagonistic towards her.

88. In this section Kurin correctly estimates the large number of individuals who have read Balter's reporting on her, which is not defamatory but based on factual reporting. Kurin is flat wrong when she asserts that were it not for Balter's writings, Kurin's reputation would be unsullied. As described above, Kurin's had a long reputation for bullying students and retaliating against them long before Balter had ever heard of her. The main reason these facts did not become public earlier is that there was wide fear that Kurin would retaliate against them, and also fear that she might bring litigation against them as she has done in the present case. Indeed, after the 2016 Title IX investigation concluded and Kurin's administrative leave was extended to three years by UCSB (not by Balter, please note) Kurin sued the Regents of the University of California because they did not give her a promotion she thought she was entitled to, even though she had been subjected to disciplinary action. Kurin did not prevail in that lawsuit.

89. As stated previously, Balter not only denies that he knew his reporting was fault, but asserts that it is true, and that he will be able to prove such at trial. Thus Kurin's speculations as to his motives are as irrelevant as they are wrong.

90. Plaintiff Kurin makes the following statement: "Balter acted with overt malice, hatred, and ill will towards Kurin. Balter's blogs repeatedly demand that Kurin not be

granted tenure and that she otherwise be banned from any kind of gainful employment. His whole purpose is to destroy Kurin and generate fame for himself in the process." As stated previously in this Answer, Balter denies that he has malice, hatred, or ill will towards Kurin, nor that he has any reason to harbor such feelings, even though the bringing of a dishonest lawsuit against him might well give Balter reason to feel that way. As previously stated, Balter's opinion—shared by many archaeologists—that Kurin should not receive tenure is protected speech. Balter denies that he is out to destroy Kurin. As for generating fame, after a career in journalism of 42 years, Balter did not need the fame that this very depressing, disturbing, and unfortunate investigation has attracted.

91. The letter by Ran Boytner cited by Kurin is filled with so many lies and falsehoods that there is not space to go over those details here. Kurin fails to mention that shortly after Boytner wrote this letter, he was terminated by IFR due to what Willeke Wendrich, chair of IFR's governing board, told colleagues was a "breach of trust." By information and belief, Balter's reporting has found that a long history of misconduct on Boytner's part also played a major role in his termination. Kurin's use of him as a witness on her behalf is very telling of her alliance with and sympathy with abusers.

92. Balter stands by his statements  about the letter, as indicated in No. 92 above.

93. Much as Balter appreciates having his writing about these matters characterized as "poetic," he also stands by the content of that reporting in every instance and denies that it is false or defamatory.

94. Balter agrees that he published the cited blog, and stands by the facts reported in it.

95. Balter agrees that he republished the blog, but denies that his statements are defamatory. Balter contends that they are true.

96. Balter did not "brag" about how much attention his reporting received. Rather, Balter expressed gratification that it was so widely read, so that colleagues could be aware of the truth and UCSB would act in the light of that truth.

97. Balter denies that his statements are false and asserts that they are backed up by extensive reporting that continues to this day. In fact, *since this litigation was filed, additional witnesses have continued to approach Balter to tell their stories of abuse, retaliation, bullying, and other misconduct by Kurin.*

98. Balter stands by the veracity of his reporting and writing about Kurin as referenced in this section. Further, based on his reporting, Balter stands by his assertion that Kurin, in a variety of ways, has continued to try to intimidate victims of her misconduct, *including after this litigation was filed with the Court (*see below.)

99. With this section of the Amended Complaint, Plaintiff Kurin begins to describe reporting and writing that Balter has done since this lawsuit was filed with the Court. Kurin seeks to convince the Court that by continuing to report accurately on both Kurin and the lawsuit itself (especially as new facts continually come to light thanks to witnesses who are very angry that Kurin has filed this action against a reporter who revealed her misconduct), Balter is continuing to defame her. This could only be true if the reporting and writing Balter continues to do is false, but it is not. In this last section of the Complaint, Kurin's aim is to get the relief she seeks from this

litigation without having to actually go through the litigation process. Thus in her request for relief, she asks this Court to order Defendant Balter to delete all of his reporting about her, a request for prior restraint impermissible under the U.S. Constitution and U.S. Supreme Court rulings on the First Amendment. As stated above, Kurin is clearly hoping that Balter will "cave" under the expense and pain of defending this lawsuit, and delete his reporting of his own accord. But to do so would not only violate Balter's professional ethics, it would also betray the many victims and survivors of abuse who have put their trust in Balter to help them tell their stories at long last. Thus Balter denies all of the contentions in this section, as stated previously.

100.     Balter agrees that he published the blog Kurin cites.

101.     Kurin again discusses the proper use of the word "guilty," and rightly quotes Balter as saying that he meant this term in the "colloquial" sense rather than in the sense of a finding in a civil or criminal trial. Since the use of this word is in dispute, it was reasonable for Balter to try to clarify what he meant by it. Kurin seeks to use Balter's own attempts to make his meaning clear as evidence that he has defamed her. This twisted logic cannot stand, and it certainly cannot be used as evidence for defamation.

102.     It is true that Balter allowed a comment to be published on his blog suggesting that Gomez had earlier raped women. Balter did this because he is currently pursuing his own investigation of these allegations, and the possibility that Gomez was indeed convicted of rape but that the records of those crimes have since been expunged. In other words, Balter was aware of these allegations even before the comment was made on the blog. Based on information and belief, Balter believes there is a high possibility that they are true. But since Gomez is not a party to this litigation, any such statements cannot be considered defamatory to Kurin. Balter has not said, nor does he say now, that Kurin knew about these allegations. Yet, since Gomez is also a subject of Balter's reporting, they are relevant and probative to the overall question of what kind of man Kurin allowed to have contact with the students she was responsible for, and what kind of man she married.

103.     Balter agrees that he responded to "Anonymous" and asked this individual to get in touch. Since Balter did not know the commenter's identity, the only way Balter could communicate with the commenter was via his blog. *This is standard reporting and journalistic technique, especially in the internet age.*

104.     Defendant Balter denies that he was obliged to come to the conclusions that Kurin insists on, especially if, as seems possible based on his reporting, any such records have now been expunged. Gomez's family is very well connected in his home town of Andahuaylas and as a reporter Balter has to consider this possibility.

105.     Balter agrees that he published the blog cited, which was an interview with a #MeToo activist in which Balter described his reporting methods and his motivations for covering this beat.

106.     According to the records Balter has examined (salaries of University of California faculty are public records) Kurin was on paid leave for all three years. If Kurin can

demonstrate that this is wrong, Balter will happily publish a correction of his good faith reporting on these factual matters.

107.    Balter agrees that he published the blog post indicated, but denies that any of his statements were defamatory.

108.    Balter contends Kurin has attempted to mislead not only this Court but also her colleagues at UCSB of the status and nature of her partnership and marriage to Gomez. Firstly, when Kurin returned to UCSB in the fall of 2019, she falsely told numerous colleagues that she was already divorced from Gomez. In fact, she clearly wanted all of her colleagues to think that she had made a clean break with Gomez, and thus lied about when the divorce was final (December 1, 2019.) As stated above, Balter has multiple witnesses that Kurin continued to associate with Gomez throughout 2019, and to sleep in the same bed with him when she was in Peru. Balter regrets that he has to delve into Kurin's personal life but it is relevant to this litigation and Balter contends that Kurin is not telling the Court the truth about it.

109.    It is true that in this very rare case, Balter deleted a few comments that he felt defamed a researcher, after looking into the matter and concluding that she had been maligned. Kurin seems to imply that this courtesy should have been paid to her as well; unfortunately, the facts did not justify it.

110.    Balter agrees that he published this blog post but denies that anything in it was defamatory.

111.    As stated above, it is true that Balter obtained Kurin's divorce records, *only after* receiving indications that she and Gomez were still living and sleeping in the same bed together when they were in Peru. Kurin has no real way of knowing whether Gomez was convicted of rape before he knew her, for obvious reasons; Balter is not contending that she knew, although he does not dismiss it as a possibility (no decent reporter would.)

112.    In this section, Kurin paints a picture both of her interactions with Gomez and of Gomez's home in Andahuaylas which, according to multiple witnesses, is totally false. Balter did originally write that Kurin was in Gomez's bedroom, in a misguided attempt to defer to her privacy. What two witnesses actually told Balter is that she slept with him in his bed as she always did when in the city. Balter stands by this reporting, and rejects all allegations that it is false or defamatory. In essence, Kurin has misled her colleagues about this ongoing relationship because she feels she cannot get tenure at UCSB unless she can convince the university that this relationship ended in August 2018 as she told the California divorce court. It did not.

113.    Balter's statements about Kurin keeping to her bedroom, and her giving students marijuana, are based on multiple witnesses to both of these behaviors. Balter contends that Kurin is simply lying to the Court about these matters.

114.    Balter contends that Kurin has indeed been contacting potential witnesses in the present litigation and that such contact has had a very intimidating effect. This pattern of behavior is habitual for Kurin who has been doing it for many years, and her methods for doing so are amply documented in the June 2016 Title IX findings. As for the conduct of Kurin's attorney, Balter does not wish to comment on that at this time, but reserves the right to do so at trial.

115.    Balter does not yet know whether the rape allegations against Gomez are true. Again, he allowed those comments to be published on his blog as part of his reporting, including encouraging possible witnesses to approach him with evidence. Since Gomez is not a party to this litigation, statements that Balter has made about Gomez are not defamatory unless Gomez wishes to bring an action and prove that they are; and again, since Balter is not claiming that Kurin knew about these alleged rapes, he has not defamed her. She cannot be held responsible for any behavior by Gomez she never knew about, but by the same token, *she must accept responsibility for conduct she did know about and continued to expose students to.*

116.    Balter agrees that he published the blog post cited, but denies that anything in it was defamatory.

117.    Beginning in this section, Kurin shows a callous disdain for the female student I have called Student No. 3, who was sexually assaulted by Gomez at her 2018 field school. At the time, and since, *Kurin has never once accepted any responsibility for what happened, never apologized to the student for her ordeal, never expressed sympathy for the trauma and pain she continues to suffer.* All Kurin apparently cares about is protecting her career from the evidence of her repeated misconduct. In this blog post, Balter allows Student No. 3 to express her own protected opinions and feelings about what happened to her, her interpretations of the role that Kurin played in her ordeal, and what she thinks should be done about it. This is protected speech, and Kurin's disrespect for a sexual assault victim is just more evidence that she has enabled the man who attacked her.

118.    Balter agrees that he published this blog post, but denies that anything in it was defamatory.

119.    Balter again denies that there was anything false and defamatory in his reporting about the sexual assault by Kurin's then husband of Student No. 3. Balter again expresses astonishment at Kurin's callous disregard for the feelings of a sexual assault victim, whom she sweeps aside in her rush to cover up her own role in her ordeal.

120.    Again, remarkably, Kurin deflects attention from a sexual assault victim trying to get justice, in this case by writing to the Chancellor of UCSB, and portrays herself as the victim in this case. Student No. 3, who revealed her identity to the Chancellor, has every right to seek redress in any way she can, and Balter, as the reporter on this investigation, has every right to report on it. There is no defamation here, but there is a continued attempt to intimidate victims of Kurin's misconduct at every opportunity.

121.    The anonymous commenter on Balter's blog that Kurin quotes has every right to express their opinion about what should be done about Kurin's misconduct; Balter's own statements are true and not defamatory.

122.    Balter agrees that he has been very active on Twitter about Kurin, especially after she filed this litigation, which is his Constitutional right under the First Amendment. Again, Balter stands by his truth of his reporting and the factual basis of the statements he has made. As stated above, Kurin is trying to get the relief she seeks at trial right now, this month, by threatening Balter that if he continues to

report on her misconduct he is tainting the jury pool. The right of a litigant to discuss, write about, and defend his statements—*especially the right of a reporter to continue to publish the results of his reporting*—should not be taken away by such threats, even if the reporter wants to shout the truth as he sees it to the skies and call press conferences every day. (As an employee of the ACLU during the 1980s, working on a lawsuit against the Los Angeles Police Department for spying on peaceful political groups, Balter himself called press conferences nearly every week and shared discovery documents with reporters, in the process giving his own opinions about the culpability of the LAPD. No one argued that the ACLU did not have the right to do this or that it would taint the Los Angeles jury pool.)

DAMAGES

123.    Balter totally denies that he is "out to destroy" Kurin, and Kurin provides no theory as to why he would want to do this. Since his allegations are based on factual reporting, any gratification that Balter might take that his work is widely read does not constitute defamation.

124.    Balter has agreed numerous times (see above) that it is his protected opinion that Kurin does not deserve tenure, based on the overwhelming evidence of her misconduct over many years.

125.    It is true that the Stanford Archaeology Center rescinded an invitation to Kurin to speak and that Balter played a role in this. A colleague informed Balter that Kurin was due to speak at the Center. The director of the Center is an archaeologist whom Balter has known for 22 years. Balter, concerned the Center did not know about the allegations concerning Kurin and might be embarrassed by having invited her, contacted the director and gave him the relevant information. Balter did not urge the director to cancel the talk but simply provided the information. The director became concerned on his own part, and the talk was cancelled. Balter's actions are constitutionally protected and do not constitute defamation since he did not provide any false information to Stanford.

126.    Since Balter has not stated any falsehoods at all about Kurin, any repetition of those statements by others is irrelevant to the issues in this litigation.

127.    Kurin makes the following statement: "In January of 2020, Kurin nominated a potential Ph.D. grad student to the UCSB program. The student was excited, as she was to be awarded a very generous package of support while working toward her Ph.D. and had come to the UCSB campus for a visit. Somehow, during that visit, Balter learned of private, Personally Identifiable Information about this prospective student, and then contacted and hounded her via email, wrote numerous lies about Kurin to her, and coerced her into withdrawing her candidacy." The first two sentences of this statement are true. The last sentence is completely false. The student, while visiting

UCSB, was contacted by both faculty and students in the department and warned about Kurin's history, which included not only enabling of sexual abuse in Peru but abuse of students at UCSB itself. This abuse has been known in the department for many years and predates her administrative leave from 2016-2019 and certainly predates Balter's knowledge that Kurin existed. One member of the department asked Balter to send the student links to his reporting, which Balter did. Balter sent the student one email to which she did not respond. Everything Balter told the student was true. Balter did not "coerce" the student into withdrawing her candidacy, nor was he in any position to do so. The student withdrew of her own accord after having been accurately informed about Kurin's behavior by several individuals.

128.    Balter agrees that in his role as an investigative reporter, he contacted members of the UCSB anthropology department to ask them to talk to him about their experiences with Kurin. Balter made no defamatory statements of any kind to these faculty members. Balter does not dispute that Kurin has very positive teaching skills, that is when she is not abusing students or engaging in inappropriate behavior in class (See http://michael-balter.blogspot.com/2020/08/university-of-california-santa-barbara.html.) But Balter is not responsible for the reactions of students who find out that her own university concluded she had engaged in misconduct.

129.    Kurin's statement that Balter was the only source of the information that Kurin had been found to have retaliated against students who reported her partner Gomez's sexual harassment is absurd and irrelevant, since that information was true and factual.

130.    The incidents at Stanford have been described above. Balter had no role whatsoever in the cancellation of any speaking engagements at UCLA nor anywhere else. However, on May 29, in a letter of concern to the faculty of UCLA'S Cotsen Institute of Archaeology, a group of graduate students stated the following about the cancellation at that campus:

"Kurin was invited to speak at the Cotsen Pizza Talk Series this Spring quarter. Upon learning about the charges against her, students took
          action to disinvite her."

131.    Balter denies that his statements about Kurin are false or defamatory.

a.   Kurin states that she has "no choice" but to sue Balter. Balter sees things very differently. Balter believes that Kurin is desperate to salvage a tenure bid that is very much on the rocks due to the exposure of her misconduct, and that she is trying to silence the reporter who has made that misconduct public. Balter believes that Kurin is also trying to silence witnesses and survivors of harassment and assault who might provide evidence to the tenure committee, including by filing new Title IX complaints as some have done this year. Balter further believes that Kurin is hoping to intimidate both the anthropology faculty and the university into giving her tenure, by implicitly threatening to sue them too if they do not. Of course the university and the faculty are aware that Kurin sued the university previously when she did not get a promotion she felt she deserved.

For that reason, a number of Kurin's colleagues and acquaintances have described her to Balter as "litigious."

b. Any damage to Kurin's reputation is entirely due to her own actions. Balter's role has been primarily to bring the truth about her misconduct to light, as is the role and responsibility of a reporter. Any of Kurin's colleagues are entirely free to form their own opinions about the matter, as is Balter himself. Thus Balter owes no damages whatsoever to Kurin, and requests the Court to deny her demands.

c. As explained above, Balter does not have malice towards Kurin, and does not want to destroy or ruin her. Balter has already stated his protected opinion about whether she should get tenure.

d. Since Balter has done nothing wrong, and has acted at all times as an ethical and professional reporter, there is no basis on which to award Kurin punitive damages. Balter asks that the Court reject this demand.


COUNT 1—LIBEL *PER SE*

132.  Defendant Balter denies each and every allegation by Plaintiff Kurin listed above.

a. While the statements in this section mischaracterize Balter's reporting about Kurin, Balter stands by the accuracy, to the best of his belief and knowledge based upon his work as a journalist, that he actually did publish.

b. To the best of his knowledge based on his own reporting, interviewing of witnesses, and examination of documents, all of Balter's statements about Kurin are true. If it turns out that Balter has made any errors in his reporting—which he does not presently admit to—they would have been made honestly. Balter denies that any statement he reported or wrote about Kurin is false.

c. Since Balter's statements are true, there is no privilege to assert other than his First Amendment rights as a journalist to write the truth as he finds it.

d. Balter has no malice towards Kurin, and in addition, he denies every statement made in this section, as detailed throughout this Answer.

e. Balter did not "target" anyone, but he did contact a large number of sources for his reporting about Kurin, as is normal practice for any journalist. While not all of the individuals contacted cooperated with Balter's reporting, many did, and their corroborated testimony provided much of the information included in Balter's reports.

f. Balter agrees that a very large number of people have seen his reports, and, like any other reporter, is happy that his honest journalism has attracted so much attention. Balter believes that widespread dissemination of information about misconduct in academia is key to bringing it to an end.

133.  Plaintiff Kurin states: "As a direct and proximate result of the false and libelous articles published by

Balter, Kurin has suffered and will continue to suffer public hatred, contempt, scorn, and ridicule." Balter contends that all of his reporting about Kurin is honest

and accurate, and that any negative consequences she has suffered are the result of her own misconduct and is entirely her own responsibility.

a. Balter has never accused Kurin of committing a crime. He has made no false and defamatory statements about Kurin. Balter has expressed his opinion only as to whether Kurin should receive tenure at UCSB; Balter's opinion is protected speech under the First Amendment of the U.S Constitution.

b. Kurin's statements about Balter's motives are unfounded and she provides no evidence for them. Kurin's statements are tainted by the fact that, as detailed above in this Answer, she ignores and/or distorts the evidence and history that Balter's reporting has helped to expose misconduct by numerous academics, who, in very many cases, have been disciplined by their own institutions. In doing this reporting, Balter has helped many victims of abuse tell their stories, sometimes after many years of suffering the consequences of the abuses. Balter's reporting is a public service, and should not be hampered by the attempts by Kurin, whose misconduct is amply documented, to paint a false portrait of him and his work.

COUNT II—SLANDER *PER SE*

c. Defendant Balter denies each and every allegation made by Plaintiff Kurin in her Complaint, as detailed in the Answer above.

d. Balter denies having slandered Kurin, and repeats that his discussions with the individuals mentioned were carried out as part of his normal work as a reporter; and that those discussions and interviews revealed considerable evidence of misconduct on Kurin's part. Balter disagrees with Kurin about the colloquial use of the word "guilty," but asserts that his use of that word does not constitute defamation given the documentation of her misconduct. Balter has reported the opinions of a number of Kurin's colleagues that she is a danger to students.

e. To the best of his information and belief, based on his extensive reporting about Kurin, Balter's statements about her are true.

f. Since Balter's statements about Kurin are true based on his information and belief, there is no privilege to assert, other than that of a reporter operating under Constitutional guarantees of freedom of the press.

g. Balter has no malice towards Kurin, and his communications with her colleagues and former students were the routine work of a reporter investigating allegations of misconduct.

h. As stated above, any harm suffered by Kurin is the result of her own misconduct over many years, long known by students and other colleagues years before Balter had ever heard of Kurin and begun reporting and writing about her. Indeed, as stated above, it was those colleagues who brought Kurin to Balter's attention and cooperated in his investigation. To put it simply, Kurin has

reversed cause and effect in blaming Balter for any harm to her reputation, which is entirely her own fault.

i.   Plaintiff Kurin mischaracterizes Balter's statements about Kurin, as detailed in this Answer above; Balter further denies that he has slandered Kurin in any way, since what he has reported about her is true based on his information and belief.

j.   Defendant Balter rejects Kurin's speculations as to his motives and repeats that his reporting has served the public good by bringing to light many cases of misconduct, often resulting in discipline by the institutions involved.

COUNT III – INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

134.   Defendant Balter denies each and every allegation in Kurin's Complaint against him.

135.   Balter agrees that Kurin was scheduled to speak at Stanford and UCLA.

a.   Balter has no knowledge of the extent to which the Stanford and UCLA speaking engagements would have helped Kurin's career and tenure bid at UCSB.

b.   Balter was made aware of Kurin's Stanford speaking engagement by a third party who had knowledge of Kurin's history of misconduct. Balter was not aware of the UCLA speaking engagement, although he did hear afterwards that it had been cancelled as mentioned above.

136.   Balter denies that any of his reporting about Kurin was or is false or defamatory.

a.   All contact that Balter had with Kurin's current or former colleagues and students was made as part of his normal work as a reporter.

b.   Any statements Balter has made about whether or not Kurin should receive tenure is opinion, albeit based on the results of his accurate and detailed reporting, and is protected speech under the U.S. Constitution.

137.   Balter denies that he acted with malice and that he "targeted" Kurin's activities.

a.   Balter cannot speak for Stanford or UCLA and their thinking processes when they cancelled Kurin's s     peaking engagements. In the case of Stanford, Balter agrees that he shared the results of his reporting with the director of the Archaeology Center, but Balter did not urge any particular action upon him. Balter had no knowledge of the UCLA speaking engagement, as stated above, until much later.

b.   Balter repeats that his reporting was in the public interest and resulted in institutional investigations and/or disciplinary proceedings in many cases. Balter adds that his reporting has been widely hailed and appreciated in the scientific community, due to an increased awareness of the need to fight misconduct and abuses.

PRAYER FOR RELIEF

Balter asks the Court, based on the evidence he is able to present in this case, to deny Kurin all of the relief she seeks, because he has not defamed her, nor slandered her, and because his reporting about her was honest and accurate to the best of his knowledge and belief, and because he holds no malice towards her.

(a) No compensatory damages are due to Kurin in any amount, for the reasons stated above.
(b) No punitive damages are due to Kurin in any amount, for the reasons stated above.
(c) The Court should not order Defendant Balter to delete or retract any of his reporting, not only because his reporting is accurate, but because such an order would be unconstitutional under the First Amendment.
(d) Since Balter has not made any false or defamatory statements about Kurin, any order that he cease to report on her misconduct (and the course of her tenure process) would be unconstitutional under the First Amendment.
(e) Defendant Balter asks the Court to award him all costs and attorney's fees he has incurred in defense of this dishonest and frivolous lawsuit, brought in an effort to silence not only his reporting, but to silence the victims and survivors of her proven and documented misconduct. Balter also believes that Kurin is attempting, through the vehicle of this lawsuit, to intimidate her colleagues in the UCSB anthropology department and in the university at large into giving her tenure whether or not she rightly deserves it. Kurin should not be compensated nor rewarded for trying to use the court system to serve these ends.

JURY DEMAND

Defendant Balter asks the Court to defer judgement on Kurin's demand for a jury trial until a future date to be determined.

Dated: August 17, 2020                                    /s/ Michael Balter
Croton on Hudson, NY                                        Acting *pro se*
                                                             148 Old Post Road South
                                                             Croton on Hudson NY

10520
                                                           Telephone: 718 751-6473
                                                            Email:

Michael.balter@gmail.com